# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 42611

CHARLES BALLARD, )
)
   Plaintiff-Respondent, )
)
v. )
)    **Boise, June 2016 Term**
)
BRIAN CALDER KERR, M.D., SILK )
TOUCH LASER, LLP, an Idaho limited )    **2016 Opinion No. 86**
liability partnership; and SILK TOUCH )
LASER, LLP, an Idaho limited liability )    **Filed: August 4, 2016**
partnership, dbas SILK TOUCH MED SPA )
and/or SILK TOUCH MED SPA AND )    **Stephen W. Kenyon, Clerk**
LASER CENTER, and/or SILK TOUCH )
MED SPA, LASER AND LIPO OF BOISE, )
)
   Defendants-Appellants. )
_____ )

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Deborah A. Bail, District Judge.

The judgment of the district court is <u>affirmed in part and vacated in part</u>, and the case is <u>remanded</u>.

Quane Jones McColl, PLLC, Boise, for appellants. Jeremiah Quane argued.

Bailey & Glasser, LLP, Morgantown, West Virginia, and Nevin, Benjamin, McKay & Bartlett, LLP, Boise, for respondent. Scott McKay argued.

_____

J. JONES, Chief Justice

This is an appeal from a jury verdict entered in a wrongful death action. Charles Ballard ("Charles") brought suit for wrongful death and medical malpractice against Silk Touch Laser, LLP ("Silk Touch") and its owner Dr. Brian Kerr. In 2010, Charles' wife Krystal Ballard ("Krystal") underwent a liposuction and fat transfer procedure at Silk Touch in Eagle, Idaho. Krystal died less than a week later from septic shock caused by unknown bacteria in her right buttock. Charles' suit alleged that the bacteria that caused Krystal's death were introduced into

1

her body during the procedure at Silk Touch because certain reusable medical equipment was not properly disinfected and sterilized.

This action first went to trial in November 2013, but ended in a mistrial. The case was retried in September 2014, and the jury returned a verdict in favor of Charles. The jury additionally concluded that Dr. Kerr and Silk Touch acted recklessly and awarded Charles $2,540,436 in economic damages and $1,250,000 in non-economic damages. After the second trial, the district court awarded Charles costs and attorney fees for the mistrial.

Silk Touch raises twenty-one issues on appeal, challenging several of the district court's evidentiary rulings, the sufficiency of the evidence supporting the verdict, several of the jury instructions, and the district court's award of costs and attorney fees. Silk Touch also alleges that the jury verdict should be overturned because the district court permitted the jurors to submit questions to witnesses and the district court made improper comments on the evidence during trial. Charles seeks attorney fees on appeal.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Silk Touch is a medical spa in Eagle, Idaho that performs cosmetic procedures. It was opened in 1999 by Dr. Kerr and his wife Susan Kerr. Dr. Kerr is a trained anesthesiologist. Originally, Silk Touch only offered laser hair removal, Botox treatment, and dermal fillers. However, Silk Touch began offering liposuction and fat transfers in 2007, after Dr. Kerr completed training on those procedures.

Krystal was a 27-year-old staff sergeant in the U.S. Air Force, stationed at Mountain Home, Idaho. She lived with her husband Charles, who was also a staff sergeant with the U.S. Air Force. On July 13, 2010, Krystal went to Silk Touch for a consultation for a liposuction and fat transfer procedure. Krystal sought to have liposuction on her abdomen and flanks and have some of the fat transferred to her buttocks. She met with Dr. Kerr, who explained the procedure and determined that Krystal was a good candidate for the surgery. On July 21, 2010, Dr. Kerr performed the procedure on Krystal. During the procedure, Dr. Kerr used both disposable and reusable medical equipment.

The reusable equipment included a Vaser handpiece, suction cannulas, and a canister. The Vaser handpiece and cannulas were used during the liposuction procedure on Krystal's

2

abdomen. The Vaser handpiece uses ultra-sound waves to break up fat into smaller pieces and then those pieces are suctioned out using the cannulas. The Vaser handpiece was not used during the liposuction on Krystal's flanks because the fat taken was to be transferred to Krystal's buttocks. The fat from Krystal's flanks was suctioned out using the same cannulas used in the abdomen liposuction. The fat taken from Krystal's flanks was then stored in a reusable canister until it was injected into Krystal's buttocks.

Dr. Kerr and other Silk Touch staff testified as to the procedures for disinfecting and sterilizing reusable medical equipment at Silk Touch. Dr. Kerr testified that Silk Touch did not have any written policies for disinfecting and sterilizing reusable medical equipment. The standard practice at Silk Touch for cleaning the Vaser handpiece was to wipe it down with an antiseptic wipe and then put the handpiece in an autoclave. Dr. Kerr testified that other reusable equipment, including the cannulas and canisters, were soaked in a basin with Hibiclens and water and then cleaned with a brush before being placed in the autoclave. An autoclave sterilizes medical equipment by steam cleaning at a high temperature. A series of indicators may be used to ensure the autoclave is functioning correctly, including chemical and biological indicators. Silk Touch used chemical but not biological indicators.

After the operation, Krystal was given post-operative instructions and a post-operative appointment was set for July 23, 2010. On the morning of July 23, 2010, Susan Kerr received a call from Krystal. Krystal told Susan Kerr that she was experiencing immense pain in her buttocks, and Krystal's post-operative appointment was moved to an earlier time that day. During the appointment, Dr. Kerr examined Krystal, noting that her wounds seemed to be healing normally. Dr. Kerr testified that he did not suspect that Krystal had an infection, but he started Krystal on an antibiotic and an anti-inflammatory steroid because she complained of pain.

Krystal's husband Charles had been out of town on a temporary duty assignment in July 2010 and was unaware of Krystal's surgery. Charles testified that he returned home on the evening of July 23, 2010. Charles further testified that throughout that evening and the next day Krystal seemed to be ill and in pain. On the evening of July 24, 2010, Krystal called Dr. Kerr, who spoke with Charles on the phone. Dr. Kerr informed Charles of the liposuction and fat transfer procedure and asked Charles to take Krystal's temperature and make sure she was taking her medication. Krystal's temperature appeared normal.

Late that evening, Krystal woke Charles up and asked him to call 911. Krystal told paramedics who arrived on the scene that she was in pain and was having trouble breathing. Krystal was transported to Elmore Medical Center in Mountain Home. At Elmore Medical Center several tests were performed on Krystal. When the results of the tests showed that Krystal had signs of an acid-base abnormality, elevated white blood cell count, and renal failure, the emergency room physician ordered that Krystal be life-flighted to St. Alphonsus Regional Medical Center in Boise. The emergency room physician also noted several possible diagnoses for Krystal's condition, including sepsis, septic shock, and acute renal failure. Sepsis occurs when an infection causes a systemic response in a person, such as shock. When a patient goes into shock his or her blood pressure lowers, which can reduce blood flow to vital organs and lead to organ failure.

On the morning of July 25, 2010, Krystal was admitted to St. Alphonsus. The emergency room physician noted that Krystal presented with abnormally low blood pressure, elevated heart rate, and potential multi-organ failure. The emergency room physician started treating Krystal for sepsis. Despite treatment, Krystal's condition worsened, and she was transferred to the intensive care unit ("ICU"). Krystal's condition did not improve in the ICU. Krystal showed signs of respiratory and renal failure and eventually was placed on full life support. While on life support, Krystal went into cardiac arrest multiple times. The fourth time Krystal went into cardiac arrest doctors were unable to resuscitate her. She died on the evening of July 25, 2010.

Krystal's case was referred to the Ada County Coroner's office. Dr. Groben, a forensic pathologist, performed an autopsy on Krystal. During his examination, Dr. Groben found gram-negative rod bacteria deep in the fat tissue in Krystal's right buttock, near the injection site for the fat transfer. Dr. Groben did not note any other signs of infection or bacteria in Krystal. Based on his examination, Dr. Groben concluded that the cause of Krystal's death was sepsis with probable toxic shock syndrome from the unknown gram-negative bacteria in her right buttock.

**B. Course of Proceedings**

On March 16, 2012, Charles filed a wrongful death and medical malpractice suit against Dr. Kerr and Silk Touch (collectively "Silk Touch"). Charles alleged that reusable medical equipment used in Krystal's procedure was not properly disinfected and sterilized. Charles further alleged that because the equipment was not properly sterilized, bacteria were introduced

4

into Krystal's right buttock during the fat transfer procedure, which caused the infection that ultimately led to Krystal's death.

The case proceeded to a jury trial on November 5, 2013. Before trial, the district court had ruled on the parties' motions in limine. As relevant here, the district court ruled that Silk Touch could not present evidence of the absence of infection in other patients. On November 14, 2013, Silk Touch presented testimony from Dr. Stiller, its standard of care expert. During Dr. Stiller's testimony, he stated that there were no pertinent or persistent infections at Silk Touch. The court declared a mistrial, concluding that Silk Touch violated the court's order and that the violation caused substantial prejudice to Charles that could not be rectified. Charles asked the district court to award him costs and attorney fees for the mistrial. At the hearing on Charles' motion, the court awarded Charles expert-witness costs but reserved ruling on attorney fees.

The case was retried from September 16, 2014 through October 2, 2014. The jury returned a special verdict, concluding that Silk Touch breached the standard of care for disinfecting and sterilizing medical equipment and that such breach was the proximate case of Krystal's death. The jury also concluded that Silk Touch acted recklessly and awarded Charles $2,540,436 in economic damages and $1,250,000 in non-economic damages. Judgment was entered against Silk Touch on October 15, 2014, and Silk Touch timely appealed the judgment. Charles filed a memorandum for costs and attorney fees. On February 5, 2015, the district court issued an order awarding Charles $19,018.91 in costs as a matter of right, $54,110.80 in discretionary costs, and $70,566.50 in attorney fees for the mistrial. The court entered a supplemental judgment on February 13, 2015, and Silk Touch timely filed an amended notice of appeal.

## II.
## ISSUES ON APPEAL

A. Whether there was sufficient evidence to support the jury's verdict:

  1. Whether there was sufficient evidence to support the jury's conclusion that Silk Touch breached the applicable standard of care.

  2. Whether there was sufficient evidence to support the jury's conclusion that Silk Touch's breach of the standard of care was the proximate cause of Krystal's death.

B. Whether the district court erred in its evidentiary rulings:

  1. Whether the district court erred in ruling that Charles' expert, Dr. Sorensen, did not have to familiarize himself with the local standard of care.

2.  Whether the district court erred in excluding Dr. Kerr's testimony on who establishes the standard of care.

3.  Whether the district court erred in ruling that testimony from Silk Touch's expert, Dr. Stiller, was unnecessarily cumulative.

4.  Whether the district court erred in sustaining Charles' objection to Silk Touch cross-examining Dr. Sorensen about E. coli.

5.  Whether the district court erred in allowing Charles to present Dr. Kerr's answer to interrogatory no. 22 to the jury.

6.  Whether the district court erred in allowing Dr. Sorensen to compare Dr. Kerr's interrogatory and deposition answers.

7.  Whether the district court erred in excluding Silk Touch's Exhibits MM and NN.

8.  Whether the district court erred in admitting Charles' Exhibit 5 and excluding Silk Touch's Exhibit H.

9.  Whether the district court erred in excluding evidence of the absence of infection in other Silk Touch patients.

C.  Whether the district court erred in its jury instructions:

1.  Whether the district court improperly instructed the jury on the applicable standard of care.

2.  Whether the district court gave an erroneous instruction on circumstantial evidence.

3.  Whether the district court gave an erroneous instruction on negligence.

4.  Whether the district court erred in submitting the issue of recklessness to the jury.

D.  Whether the district court's judgment should be reversed because the court made improper comments on the evidence.

E.  Whether the district court abused its discretion in permitting juror questions.

F.  Whether the district court's judgment should be reversed under the doctrine of cumulative error.

G.  Whether the district court abused its discretion by awarding Charles attorney fees and costs for the mistrial.

H.  Whether Charles is entitled to attorney fees on appeal.

## III.
## ANALYSIS

### A. Whether there was sufficient evidence to support the jury's verdict.

"This Court will not set aside a jury verdict on appeal if it is supported by substantial and competent evidence." *Van v. Portneuf Med. Ctr., Inc.*, 156 Idaho 696, 700, 330 P.3d 1054, 1058 (2014). "[W]hen reviewing a jury verdict on appeal the evidence adduced at trial is construed in a light most favorable to the party who prevailed at trial." *Id.* (quoting *Garrett Freightlines, Inc.*

6

*v. Bannock Paving Co., Inc.*, 112 Idaho 722, 726, 735 P.2d 1033, 1037 (1987)). "The evidence supporting the jury's verdict may be contradicted, but the verdict will be upheld if it is 'of such sufficient quantity and probative value that reasonable minds could conclude that the verdict of the jury was proper.'" *Mackay v. Four Rivers Packing Co.*, 151 Idaho 388, 391, 257 P.3d 755, 758 (2011) (quoting *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 736, 518 P.2d 1194, 1198 (1974)). "This Court will not second guess the jury's determinations as to the weight of the evidence and witness credibility." *Id.*

> 1. There was substantial evidence to support the jury's conclusion that Silk Touch breached the applicable standard of care.

Idaho Code section 6-1012 requires a plaintiff bringing a medical malpractice claim to prove, by direct, competent expert testimony and by a preponderance of the evidence, that the defendant negligently failed to meet the applicable standard of health care practice. "That standard is specific to 'the time and place of the alleged negligence' and 'the class of health care provider that such defendant then and there belonged to. . . .'" *Mattox v. Life Care Ctrs. of Am., Inc.*, 157 Idaho 468, 473, 337 P.3d 627, 632 (2014) (quoting I.C. § 6-1012). "The defendant's care is judged against 'similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any.'" *Id.* (quoting I.C. § 6-1012). The term "community" refers to "that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided." I.C. § 6-1012. To be considered competent, the medical expert must show that "he or she is familiar with the standard of health care practice for the relevant medical specialty, during the relevant timeframe, and in the community where the care was provided" and "must explain *how* he or she became familiar with that standard of care." *Bybee v. Gorman*, 157 Idaho 169, 174, 335 P.3d 14, 19 (2014) (internal quotation marks omitted); *see also* I.C. § 6-1013.

> a. *There was substantial evidence to support a finding that Dr. Sorensen was familiar with the applicable standard of care.*

As a preliminary matter, Silk Touch argues extensively on appeal that the district court should have excluded testimony from Charles' standard of care expert Dr. Sorensen because he did not establish that Dr. Sorensen was familiar with the applicable standard of care. However, Silk Touch has not pointed to any instance where it asked the court to exclude the testimony of Dr. Sorensen on this basis. Silk Touch did not challenge the admissibility of Dr. Sorensen's

testimony in its motions in limine. Additionally, Silk Touch does not point to any instance prior to or during trial that it raised an objection to Dr. Sorensen's testimony on the applicable standard of care because it failed to meet the foundational requirements provided in Idaho Code section 6-1013. Under Idaho Rule of Evidence 103(a), error may not be predicated on a ruling admitting evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context." Silk Touch has failed to point to a timely objection or motion to strike on the record. Therefore, we decline to address Silk Touch's arguments that the district court erred in admitting Dr. Sorenson's testimony on the standard of care.

Additionally, there is substantial evidence in the record supporting that Dr. Sorenson was familiar with the applicable standard of care. Dr. Sorensen testified that he was familiar with the standard of care for sterilizing and disinfecting reusable medical equipment that applied to non-plastic surgeons who performed cosmetic surgeries in the Boise area in 2010. Dr. Sorensen is a cosmetic surgeon who practiced in the Boise area in 2010 and is certified in both plastic surgery and general surgery. Dr. Sorensen testified that he gained familiarity with the applicable standard of care by: (1) having worked with both plastic surgeons and non-plastic surgeons who perform cosmetic surgeries in the Boise area and observing how they sterilize equipment and (2) through his role as an inspector for the American Academy of Accrediting Surgery Centers, where he observed practices for disinfecting and sterilizing equipment in facilities performing cosmetic surgery in the Boise area when inspecting those facilities for accreditation. Although Silk Touch was not an accredited facility, Dr. Sorensen testified that based on his experience working in the Boise area, the standard of care for disinfecting and sterilizing equipment is the same for accredited and non-accredited facilities.[1] Silk Touch alleges that Dr. Sorensen lacked actual knowledge of the standard of care that applied to Dr. Kerr because Dr. Kerr was not a cosmetic surgeon and worked in Eagle rather than Boise.

Although Dr. Sorensen is arguably of a different specialty, as he is a certified plastic surgeon and Dr. Kerr is an anesthesiologist who performs cosmetic surgery, this would not preclude Dr. Sorensen from testifying on the applicable standard of care.[2] "[I]t is unnecessary for

---

[1] The parties agree that, in Idaho, accreditation is not mandatory.
[2] The parties agree that, in Idaho, a doctor is not required to be certified in cosmetic surgery to perform the types of procedures Dr. Kerr was performing at Silk Touch.

8

an expert witness to be of the same specialty as the defendant so long as the expert establishes he possesses actual knowledge of the standard of care to be applied." *Newberry v. Martens*, 142 Idaho 284, 292, 127 P.3d 187, 195 (2005). An expert of a different specialty may obtain actual knowledge of the standard of care through interacting and practicing with physicians of the applicable specialty. *Id.* Dr. Sorensen stated that he was familiar with the applicable standard of care through practicing in the Boise area in 2010, interacting with both plastic surgeons and non-plastic surgeons who perform cosmetic surgery, and through inspecting facilities in the Boise area that perform cosmetic surgery.

Additionally, Dr. Sorensen testified that he practiced at St. Luke's in Meridian, Idaho, which frequently saw patients from Eagle. Dr. Kerr also testified that Silk Touch advertised to patients throughout Boise, Nampa, Caldwell and surrounding areas. Silk Touch argues on appeal that St. Alphonsus has a hospital in Eagle, and Dr. Sorenson had not testified that he was familiar with the standard of care applied specifically in Eagle. This Court recently clarified the standard for determining the applicable community:

> Rather than choosing to define community by means of distance from the nearest licensed general hospital, the legislature chose to define community by reference to the locations from which the patient base of the hospital is derived. If users of the hospital's services commonly go from one location to the place where the hospital is located, then that location falls within the geographical area which constitutes the community. As we implicitly recognized in *Ramos,* it is because people residing at one location may commonly use the services provided by more than one hospital, communities may overlap one another.

*Bybee*, 157 Idaho at 176, 335 P.3d at 21 (citing *Ramos v. Dixon*, 144 Idaho 32, 35, 156 P.3d 533, 536 (2007)). Evidence was presented that patients from Eagle go to hospitals in neighboring areas and Silk Touch solicited patients throughout the Boise area. Therefore, there was substantial evidence in the record to support that the applicable community included the greater Boise area.

Based on the foregoing, there was substantial evidence to support that Dr. Sorensen was familiar with the standard of care for disinfecting and sterilizing medical equipment that applied to similarly trained and qualified providers of the same class and in the same community as Dr. Kerr.

      b. *There was substantial evidence to support a finding that Silk Touch breached the applicable standard of care.*

Dr. Sorensen opined that Silk Touch breached the applicable standard of care for disinfecting and sterilizing medical equipment. Specifically, Dr. Sorensen testified that in order to meet the applicable standard of care, Silk Touch needed to follow the guidelines for disinfecting and sterilizing medical equipment provided by the Center for Disease Control ("CDC"), the Idaho Department of Health and Welfare, and the manufacturers of equipment Silk Touch used such as the Vaser handpiece. On appeal, Silk Touch argues that under Idaho Code section 6-1014, guidelines or standards established by the state or federal government cannot be used or considered as a basis for establishing an applicable community standard of care. This is inaccurate.

Idaho Code section 6-1014(1) provides in relevant part:

> In determining whether a health care practitioner has met a standard of care under this chapter or under any other Idaho statute, no criteria, guideline, standard or other metric established or imposed by the patient protection and affordable care act (PPACA), P.L. 111-148, established or imposed by or pursuant to any other law or regulation of the United States or any entity or agency thereof and used for the purpose of determining reimbursement or a rate of reimbursement for the care provided, or established or imposed by another state or by a third party payor, shall be used as a basis for establishing an applicable community standard of care.

The plain language of this statute states that no criteria, guideline, standard or other metric shall be used to establish an applicable standard of care if the standard is: (1) established or imposed by the PPACA or any other law or regulation of the United States or an entity thereof *and* used for the purpose of determining reimbursement or a rate of reimbursement for the care provided or (2) established or imposed by another state or by a third party payor.[3] Section 6-1014 was expressly enacted to prevent quality metrics adopted in the Affordable Care Act or by insurers from being used to establish the standard of health care practice in Idaho. Statement of Purpose, S.B. 1355, 2014 Leg., RS Doc. No. 22854C1.[4] This statute does not apply to guidelines established by the CDC, the Idaho Department of Health and Welfare, or manufacturers of medical equipment.

Dr. Sorensen opined that these guidelines require reusable medical equipment, such as the Vaser handpiece, cannulas, and reusable canisters used in Krystal's procedure, to be soaked

---

[3] Third party payor is defined as "any entity subject to the jurisdiction of the department of insurance under title 41, Idaho Code, and also includes any federal, state or local government entity and its contractors making payments or administering any plan or program paying for health care services." I.C. § 6-1014(3)(b).

[4] Available at http://legislature.idaho.gov/legislation/2014/S1355SOP.pdf.

in an enzymatic cleaner before such equipment is placed in the autoclave for steam sterilization. Additionally, Dr. Sorensen testified that the CDC guidelines suggest the use of biological indicators in the autoclave to ensure that the steam sterilization process is killing bacteria and that using biological indicators was the standard of practice in the Boise area in 2010.

Throughout trial, Charles published deposition testimony from Dr. Kerr that described the procedures used at Silk Touch for disinfecting and sterilizing medical equipment. That testimony went as follows:

> Question: I think you wipe down the handpiece because it can't be submerged with an aseptic wipe.
> Answer: Correct.
> Question: Okay. Now, what's the next step in the cleaning, disinfecting, and sterilizing the handpiece from the Vaser system?
> Answer: To autoclave it, V-a-s-e-r.
> Question: Okay. Is there anything between wiping down with aseptic wipes and autoclaving?
> Answer: With the handpiece, no.
> Question: Okay. What about the rod and cap, the wrench, the suction cannulas, and the handles and collar? Are all of those -- after you wipe them down with Hibiclens, are those cleaned, disinfected, and sterilized in the same manner?
> Answer: Are they all cleaned? No.
> Question: Okay. Let's separate them out. For instance, once you use the Hibiclens, as you've described with the rod, the cap, wrench, cannulas, handles, and collars, what's the next step in the cleaning, disinfecting, and sterilization process?
> Answer: They are washed in a bath of Hibiclens and hot water.
> . . . .
> Question: Okay. Do you use any -- anything else other than Hibiclens and water to soak those particular pieces of equipment?
> Answer: No.
> . . . .
> Question: Okay. Let me get to that. After you soak them in this water Hibiclens, you use the brush to kind of scrub off any additional debris that may be there?
> Answer: Correct.
> Question: All right. And then where do you go after you use a brush to scrub them off?
> Answer: They are rinsed off and placed in the autoclave.
> Question: Okay. Rinsed off with tap water?
> Answer: Correct.
> Question: All right. After you rinse them off with tap water, are they then immediately placed in the autoclave?
> Answer: They are placed in the autoclave cassette, then placed in the autoclave.
> . . . .

Question: Okay. Now, going back a couple of steps. As far as the Hibiclens and water, is there any type of other cleaner that is used in that process before those pieces of equipment get into the autoclave?
Answer: No.
Question: All right. Do you use any type of enzymatic cleaner in the process?
Answer: No.

Dr. Sorensen testified that the procedures described by Dr. Kerr during his deposition do not meet the standard of care. Dr. Sorensen stated that Hibiclens is not an appropriate solution to disinfect and sterilize reusable medical equipment and that it is not approved by the CDC for such use. He further testified that the use of Hibiclens is inappropriate because it is not designed to clean or sterilize instruments, but rather is designed to remove bacteria from a person's skin before a minor surgery. Dr. Sorensen also testified that Dr. Kerr did not mention soaking reusable medical equipment in an enzymatic cleaner or other detergent.[5] Dr. Sorensen testified that the use of an enzymatic cleaner is important because its purpose is to dissolve material from the human body, known as proteinaceous debris, which cannot be removed by cleaning the equipment with a brush. Dr. Sorensen further stated that if proteinaceous debris is not removed it insulates bacteria from being killed during the steam sterilization process in the autoclave.

During trial, Dr. Kerr and Briana Dumas testified that Silk Touch used chemical indicators in the autoclave system but not biological indicators. Dr. Sorensen opined that this fell below the standard of care. Dr. Sorensen testified that an autoclave sterilizes medical equipment by steam cleaning at a high temperature. Dr. Sorensen also stated that a series of indicators may be used to ensure the autoclave is functioning correctly, including chemical and biological indicators. Chemical indicators are used to determine whether the autoclave is reaching the required temperature for sterilization. Biological indicators are small tubes with resistant bacteria that are placed in the autoclave. If the bacteria in the tube are killed during the autoclave cycle, it indicates that the sterilization process is killing any bacteria on the equipment. Dr. Sorensen

_____

[5] There was conflicting testimony presented at trial as to whether Silk Touch used a detergent when disinfecting and sterilizing medical equipment. Charles presented the above testimony from Dr. Kerr's deposition and Dr. Kerr's answers to interrogatory no. 22, which set forth similar procedures. Silk Touch presented testimony from Brian Dumas that Silk Touch did soak the equipment in a detergent after brushing it. As the Court will not second-guess the jury's determination of the weight of the evidence or credibility of witnesses, the conflicting evidence on the use of detergent presented by Silk Touch is irrelevant here. *See Mackay*, 151 Idaho at 391, 257 P.3d at 758. However, it is worth noting that Dr. Stiller, Silk Touch's standard of care expert, opined that Silk Touch did not breach the standard of care because it used a detergent. Dr. Stiller conceded on cross-examination that if Silk Touch did not use either a detergent or enzymatic cleaner it would have breached the standard of care.

opined that the use of a biological indicator was particularly important because it was the only indicator that tested whether the autoclave was actually killing bacteria.

The foregoing testimony provided substantial evidence to support the jury's finding that Silk Touch breached the applicable standard of care by not using an enzymatic cleaner and by not using biological indicators in its autoclave.

> 2. <u>There was substantial evidence to support the jury's finding that Silk Touch's breach of the standard of care was a proximate cause of Krystal's death.</u>

"In a medical malpractice case, a 'plaintiff has the burden of proving not only that a defendant failed to use ordinary care, but also that the defendant's failure to use ordinary care was the proximate cause of damage to the plaintiff.'" *Easterling v. Kendall*, 159 Idaho 902, 914, 367 P.3d 1214, 1226 (2016) (quoting *Pearson v. Parsons*, 114 Idaho 334, 339, 757 P.2d 197, 202 (1988)).

> To establish proximate cause, a plaintiff must demonstrate that the provider's negligence was both the actual and legal (proximate) cause of his or her injury. Actual cause is a factual question focusing on the antecedent factors producing a particular consequence. Legal cause exists when it is reasonably foreseeable that such harm would flow from the negligent conduct.

*Id.* (citations and internal quotation marks omitted). Proximate cause may be proved by direct evidence or a "chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable." *Weeks v. E. Idaho Health Servs.*, 143 Idaho 834, 839, 153 P.3d 1180, 1185 (2007) (quoting *Sheridan v. St. Luke's Reg'l Med. Ctr.*, 135 Idaho 775, 785, 25 P.3d 88, 98 (2001)).

At trial, Dr. Sorensen opined that Silk Touch breached the applicable standard of care for disinfecting and sterilizing medical equipment by failing to soak reusable medical equipment in an enzymatic cleaner and by not using biological indicators to ensure that the autoclave was killing bacteria. Dr. Kerr testified that reusable medical equipment was used in Krystal's procedure, including a Vaser handpiece, suction cannulas, and canisters. Dr. Kerr testified that he used the Vaser handpiece during the liposuction on Krystal's abdomen to break up fat into smaller pieces, which were then suctioned out using the cannulas. The same cannulas were used to suction fat from Krystal's flanks and that fat was stored in a canister until it was injected into Krystal's right and left buttocks.

Dr. Sorensen stated that he reviewed Krystal's medical records from Elmore Medical Center and St. Alphonsus Regional Medical Center where treating physicians recorded that

Krystal presented with extremely low blood pressure and potential organ failure and recorded sepsis and septic shock as possible diagnoses. Dr. Sorensen explained that sepsis is an infection that causes a systemic response. Dr. Sorensen further explained that septic shock is a continuation of sepsis where an infection causes the body to go into shock which causes extremely low blood pressure and decreased blood flow to vital organs. Dr. Sorensen also reviewed the autopsy report prepared by Dr. Groben, which concluded that Krystal died from septic shock and organ failure caused by gram-negative rod bacteria found in Krystal's right buttock, near the injection site for the fat transfer. Based on this information, Dr. Sorensen opined that bacteria were introduced into Krystal's buttock during the fat transfer procedure because Silk Touch failed to properly sterilize its reusable medical equipment and that bacteria caused the infection that led to Krystal's death.

Testimony was also presented from Dr. Groben, the forensic pathologist who performed Krystal's autopsy, and Dr. Nichols, another forensic pathologist retained by Charles for this proceeding. Dr. Groben testified that he found large numbers of gram-negative rod bacteria in the subcutaneous fat in Krystal's right buttock, near the injection site of the fat transfer. Dr. Groben also testified that he found large numbers of white blood cells in that area indicating an infection. Dr. Groben further testified that there were no other signs of infection or other gram-negative rod bacteria in Krystal's body except early neutrophils in her lungs, which is common in someone who has been recently hospitalized. Dr. Groben ultimately concluded that the cause of Krystal's death was sepsis with probable toxic shock syndrome from unknown gram-negative rod bacteria.

Dr. Nichols testified that the tissue sample taken from Krystal's right buttock during the autopsy showed evidence of a bacterial process associated with infection and that the bacteria were placed horizontally, parallel to the skin surface. Dr. Nichols found this to be significant because the bacteria did not show a vertical path from the skin, but rather, looked like they had been introduced deep into the fat tissue, parallel to the skin. Dr. Nichols opined that if the bacteria were introduced through Krystal's skin there would be signs of bacteria traveling in a vertical line from the skin to the subcutaneous tissue. Dr. Nichols further opined that the types of white blood cells in the sample showed that the infectious process had been ongoing for two to three days before Krystal died. Based on this information, Dr. Nichols concluded that the only plausible way the bacteria could have been introduced into Krystal's buttock was through the

injection of contaminated fat during the fat transfer procedure performed at Silk Touch. Dr. Nichols also stated that the localized bacteria found in Krystal's buttock likely contained a toxin that caused her body to go into shock which led to the progressive failure of her vital organs. Dr. Nichols testified that these localized bacteria could cause a lethal reaction because the toxin could be diffused throughout the body without the bacteria spreading.

As a preliminary matter, Silk Touch alleges that Dr. Sorensen's and Dr. Nichols' testimony should have been excluded because their opinions are unreliable and speculative. There is no indication in the record that Silk Touch objected to the admission to Dr. Nichols' testimony. Therefore, we affirm the district court's admission of his testimony. *See* I.R.E. 103(a). Silk Touch did object to the admission of Dr. Sorenson's causation opinions, but only on the basis of "lack of foundation." As we recently stated in *Hansen v. Roberts*, "[f]or an objection to be preserved for appellate review, either the specific ground for the objection must be clearly stated, or the basis of the objection must be apparent from the context." 154 Idaho 469, 473, 299 P.3d 781, 785 (2013) (internal quotation marks omitted). This Court has previously held "that an objection that 'no proper foundation has been laid,' was not sufficiently specific because it failed to state 'wherein the foundation for the opinion was insufficient.'" *Id.* (quoting *Hobbs v. Union Pac. R.R. Co.*, 62 Idaho 58, 74, 108 P.2d 841, 849 (1940)). Silk Touch's objection to Dr. Sorensen's causation opinions based on "lack of foundation" is not sufficient to preserve its argument on appeal that Dr. Sorensen's testimony should have been excluded because it was unreliable and speculative.

On appeal, Silk Touch alleges that there was insufficient evidence to establish proximate cause because Dr. Sorensen's testimony did not establish that bacteria was actually on the reusable medical equipment used in Krystal's procedure. Additionally, Silk Touch argues that the evidence presented by Charles fails to establish how the bacteria actually got into Krystal's right buttock or to address why the bacteria was not also found in Krystal's left buttock if the bacteria were introduced during the fat transfer.

Charles contends that Dr. Sorensen's testimony was sufficient to show a chain of circumstances that allowed a jury to reasonably conclude that the reusable equipment used in Krystal's procedure was contaminated because Silk Touch did not soak the equipment in an enzymatic cleaner and did not ensure bacteria were being killed in the autoclave by using biological indicators. Additionally, Charles argues that testimony from Dr. Groben and Dr.

Nichols was sufficient to establish that the bacteria found in Krystal's right buttock were injected during the fat transfer because the bacteria were found deep in the fat tissue near the injection site and ran parallel to the skin.

As this Court stated in *Formont v. Kircher*:

> The rule would seem to be that respondent was not required to prove his case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that he show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. . . .
>
> If the rule of law is as contended for by defendant and appellant, and it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science.

91 Idaho 290, 296, 420 P.2d 661, 667 (1965) (citations and internal quotation marks omitted). On appeal, Silk Touch asks us to hold that Charles was required to establish conclusively, through direct evidence, that the reusable equipment used in Krystal's procedure was contaminated, and the bacteria found in Krystal's buttock were introduced during the fat transfer. This is asking for the impossible. The liposuction and fat transfer procedure was performed on Krystal on July 21, 2010. The gram-negative rod bacteria were not found until an autopsy was conducted on July 26, 2010. As Dr. Groben testified, by the time the bacteria were identified it was too late to inspect the instruments used in Krystal's procedure.

Dr. Sorensen testified Silk Touch breached the standard of care by failing to use an enzymatic cleaner and that the use of an enzymatic cleaner is important because it removes proteinaceous debris, which if not removed may insulate bacteria and allow them to survive steam sterilization. Additionally, Dr. Sorensen testified that Silk Touch breached the standard of care by not using biological indicators which are the only indicators that show if the autoclave is actually killing bacteria. According to Dr. Sorensen, the Vaser handpiece, cannulas and canister used in Krystal's procedure were not properly sterilized. Silk Touch agrees that the natural consequence of failing to properly sterilize medical equipment is an increased risk of introducing bacteria into a patient, which can lead to infection. Dr. Groben testified that gram-negative rod bacteria found near the injection site in Krystal's right buttock caused Krystal to go into septic shock which led to her vital organs failing and ultimately her death. Dr. Nichols opined that the only plausible source of the bacteria was the fat injected during the procedure performed at Silk Touch because the bacteria were located deep in the fat tissue and ran parallel to the skin. The foregoing testimony provided substantial evidence upon which a jury could reasonably conclude

that the bacteria found in Krystal's right buttock came from contaminated medical equipment used in the fat transfer procedure.

Silk Touch suggests that in order to establish proximate cause Charles had to eliminate the possibility that the bacteria was E. coli that was introduced to Krystal's buttock because Krystal did not properly care for herself after the surgery. Additionally, Silk Touch makes much of the fact that its causation expert, Dr. Coffman, testified the bacteria could not have been introduced during the fat transfer because there were no signs of infection in Krystal's left buttock. First, Dr. Nichols' testimony that the bacteria could not have entered Krystal's buttock through her skin directly contravenes the theory that the bacteria was E. coli introduced into Krystal's buttock because she failed to properly care for herself after the procedure. Second, although Dr. Coffman's testimony provides some evidence contradicting the causation theory Charles presented, the fact that contravening evidence was presented does not mean that there was not substantial evidence to support the jury's finding. "By substantial, it is not meant that the evidence need be uncontradicted. All that is required is that the evidence be of such sufficient quantity and probative value that reasonable minds could conclude that the verdict of the jury was proper." *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 736, 518 P.2d 1194, 1198 (1974). On appeal, this Court will not reweigh the evidence or second guess the jury's determination as to a witness's credibility. *Mackay v. Four Rivers Packing Co.*, 151 Idaho 388, 391, 257 P.3d 755, 758 (2011). It was within the province of the jury to weigh conflicting evidence and we will not second guess that decision on appeal.

We hold that there was substantial evidence supporting the jury's finding that Silk Touch's breach of the standard of care was the proximate cause of Krystal's death.

**B. Whether the district court erred in its evidentiary rulings.**

"Error may not be predicated upon a ruling which admits or excludes evidence unless the ruling is a manifest abuse of the trial court's discretion and a substantial right of the party is affected." *Van v. Portneuf Med. Ctr., Inc.*, 156 Idaho 696, 701, 330 P.3d 1054, 1059 (2014); *see also* I.R.E. 103(a); I.R.C.P. 61. In applying the abuse of discretion standard, the Court employs a three step inquiry: "(1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason." *Mattox v. Life Care Ctrs. of Am., Inc.*, 157 Idaho 468, 473, 337 P.3d 627,

632 (2014) (quoting *McDaniel v. Inland Nw. Renal Care Grp.-Idaho, LLC*, 144 Idaho 219, 221–22, 159 P.3d 856, 858–59 (2007)).

1. <u>We decline to address Silk Touch's argument that the district court erred in ruling that Dr. Sorensen did not have to familiarize himself with the local standard of care.</u>

Silk Touch alleges that the district court erred in ruling that Dr. Sorensen, did not have to familiarize himself with the local standard of care. However, Silk Touch fails to point to a specific ruling of the district court which it is challenging. Rather, Silk Touch argues that the court "ruled" Dr. Sorensen did not have to familiarize himself with the local standard of care when overruling Charles' objection to the publication of part of Dr. Sorensen's deposition.

During cross-examination, Silk Touch sought to publish parts of Dr. Sorensen's deposition where he testified that in 2006 and 2007 he spoke with non-plastic surgeons who performed cosmetic surgery in the Boise area. Charles objected, stating that the 2006–07 timeline was not relevant. Silk Touch argued that the deposition testimony was relevant to challenging the foundation of Dr. Sorensen's opinions because his opinion on the applicable standard care was based in part on these interactions, and they had little bearing on the standard of care in 2010. Silk Touch contends that in responding to its argument, the court ruled that Dr. Sorensen did not have to familiarize himself with the local standard of care. The district court did express concern that the date when Dr. Sorensen spoke with these providers may not be relevant because Dr. Sorensen was a local expert and was not required to speak with local providers. However, this discussion on relevance did not lead to a ruling adverse to Silk Touch. In fact, the district court ruled in Silk Touch's favor. "It is well established that in order for an issue to be raised on appeal, the record must reveal an adverse ruling which forms the basis for an assignment of error." *Whitted v. Canyon Cnty. Bd. of Comm'rs*, 137 Idaho 118, 121, 44 P.3d 1173, 1176 (2002). Because Silk Touch has not pointed to an adverse ruling by the district court, we decline to address this issue.

2. <u>The district court did not abuse its discretion by excluding Dr. Kerr's testimony on who establishes the applicable standard of care.</u>

During trial, Silk Touch asked Dr. Kerr who he believed establishes the standard of health care practice. Charles objected on the ground that the issue was a matter of law and the district court sustained his objection. The district court concluded that Dr. Kerr could testify as to what goes into the standard of care from a factual standpoint, but that the applicable standard of

care is a legal issue that would be addressed in the jury instructions. The district court then went on to instruct the jury:

> The standard of care is the applicable standard of health care practice of the community in which such care allegedly was or should have been provided as such standard existed at the time and place of the alleged negligence and of such physician, keeping in mind that individual providers in health care are judged in comparison with similarly-trained and qualified providers of the same class in the same community taking into account his or her training, experience, and fields of medical specialization.

However, the district court did allow Dr. Kerr to offer testimony that the Vaser handpiece manual, the CDC guidelines, medical literature, and the Idaho Department of Health and Welfare guidelines relied on by Dr. Sorensen were not relevant to the standard of care applicable to Dr. Kerr. Silk Touch alleges that the district court erred in sustaining Charles' objection because it unfairly precluded Dr. Kerr from testifying as to who establishes the standard of health care practice.

This Court has not expressly addressed whether a district court may exclude testimony of an expert because it consists of legal conclusions. However, federal courts have held that expert testimony consisting of legal conclusions may be excluded. *See, e.g., Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212–13 (D.C. Cir. 1997); *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985). In *Burkhart*, the D.C. Circuit noted that the admissibility of expert testimony depends in part on whether it will assist the trier of fact in understanding the evidence or determining a fact at issue. 112 F.3d at 1212 (citing F.R.E. 702). The court found that testimony consisting solely of legal conclusions does not assist the trier of fact in this way and therefore is inadmissible under Federal Rule of Evidence 702. *Id*. Although not identical to the federal rule, Idaho Rule of Evidence 702 also provides that expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" in order to be admissible. I.R.E. 702.

In *Torres*, the Sixth Circuit stated, "[t]he problem with testimony containing a legal conclusion is in conveying the witness's unexpressed, and perhaps erroneous, legal standards to the jury. This 'invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law.'" 758 F.2d at 150 (quoting *F.A.A. v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983)). The court went on to conclude that "[t]he best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct, and specialized

19

meaning in the law different from the present in the vernacular. If they do, exclusion is appropriate." *Id*. at 151. "Standard of care" has a specialized meaning in medical malpractice actions and is defined in detail in Idaho Code section 6-1012.

The district court did not abuse its discretion in ruling that Dr. Kerr could give factual opinions as to the standard of care that applied to him and whether or not it encompassed considerations that informed Dr. Sorensen's view of the standard, but that Dr. Kerr could not opine on who established the standard of care.

3. <u>The district court did not abuse its discretion in ruling that testimony offered by Dr. Stiller was unnecessarily cumulative.</u>

In Charles' case in chief, Dr. Sorensen testified that the procedures for disinfecting and sterilizing reusable equipment at Silk Touch fell below the standard of care for facilities performing cosmetic surgery in the Boise area in 2010. Specifically, Dr. Sorensen testified that Silk Touch was required to use biological indicators to make sure the autoclave was functioning properly and was required to soak the reusable equipment in an enzymatic cleaner. Dr. Sorensen further opined that the bacteria found in Krystal's right buttock were introduced into her body during the fat transfer procedure.

In its defense, Silk Touch offered testimony from Dr. Stiller. Dr. Stiller is a certified general surgeon and cosmetic surgeon who practices in Moscow, Idaho and surrounding areas. On direct examination, Dr. Stiller testified that in Idaho there is no requirement that enzymatic cleaners, as opposed to detergents, be used to disinfect and sterilize reusable medical equipment. Additionally, Dr. Stiller testified that the purpose of a detergent is to wash off the equipment and what really kills bacteria is the steam sterilization process that happens in the autoclave. Dr. Stiller also testified that whether Dr. Kerr used biological indicators in the autoclave is immaterial because where the proper temperature was achieved, as shown through the chemical indicator, the risk of infection is minimal. Dr. Stiller opined that Krystal did not die from an infection caused by bacteria introduced during the fat transfer. Dr. Stiller believed that if the bacteria in Krystal's right buttock had come from contaminated medical equipment there would also have been signs of infection in Krystal's left buttock.

After this testimony was presented, Silk Touch's counsel asked Dr. Stiller if he had an opinion as to whether Krystal would have died if Dr. Kerr had done everything the way Dr. Sorensen says he should have done it. Charles objected on the basis that the testimony would be speculative. The district court sustained Charles' objection, concluding that this issue had already

been covered throughout Dr. Stiller's testimony, and further testimony on this issue would be unnecessarily cumulative.

On appeal, Silk Touch alleges that the district court erred in sustaining the objection because the testimony offered by Dr. Stiller was not cumulative. Charles argues that the district court did not err in ruling that the testimony was cumulative because Dr. Stiller had previously testified extensively regarding his opinion that Silk Touch's failure to use an enzymatic cleaner and biological indicators would not have impacted the sterility of the equipment.

Idaho Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The district court did not abuse its discretion in excluding this testimony by Dr. Stiller. Whether evidence sought to be presented is cumulative is a factual issue and a district court's finding on this issue will not be overturned if supported by substantial and competent evidence. *See Reed v. Reed*, 137 Idaho 53, 56, 44 P.3d 1108, 1111 (2002). Dr. Stiller had testified that whether Dr. Kerr used enzymatic cleaners or biological indicators would have little to no impact on whether reusable equipment was properly sterilized. Additionally, Dr. Stiller testified that the bacteria in Krystal's buttock could not have been transmitted from contaminated reusable equipment used during the fat transfer procedure because there were no signs of infection in Krystal's left buttock. This testimony provided substantial evidence to support the court's finding that Dr. Stiller had already expressed his belief that Krystal would have died even if Dr. Kerr followed the procedures outlined by Dr. Sorensen. Additionally, the probative value of the testimony offered was minimal, as Dr. Stiller was merely asked to give a conclusory statement based on his prior testimony. Accordingly, the district court did not abuse its discretion in finding that the probative value of the testimony was substantially outweighed by concerns over the needless presentation of cumulative evidence.

4. <u>Any error the district court allegedly committed by sustaining Charles' objection to questioning Dr. Sorensen about E. coli was harmless.</u>

During direct examination, Dr. Sorensen testified that he believed Silk Touch used substandard sterilization procedures which led to the infection that caused Krystal's death. In reaching this opinion, Dr. Sorensen testified that he relied in part on Dr. Groben's autopsy report, which concluded that the cause of Krystal's death was septic shock caused by gram-negative rod

21

bacteria found in Krystal's right buttock, near the injection site for the fat transfer. On cross-examination, Silk Touch asked Dr. Sorensen if the autopsy established what type of gram-negative rod bacteria was found in Krystal's right buttock. Dr. Sorensen testified that the autopsy only established that the bacteria were gram-negative rod bacteria and no tests were performed to determine the exact type.

Silk Touch then sought to ask Dr. Sorensen about the gram-negative rod bacteria E. coli and where it lives in the human body. Charles objected on the basis that the questioning was irrelevant and outside the scope of direct examination. The district court sustained Charles' objection, concluding that the questioning exceeded the scope of direct examination and that this issue would be better addressed by other expert witnesses who were familiar with microbiology. However, directly after this ruling, Silk Touch questioned Dr. Sorensen about statements he made about E. coli during his deposition. Charles objected, but the court overruled his objection. Silk Touch then questioned Dr. Sorensen about his deposition statements that E. coli resides mainly in the colon. Silk Touch was then able to elicit testimony from Dr. Sorensen that E. coli is a gram-negative rod bacterium that can escape the colon through stool and thrive and cause infection if introduced into sterile tissue.

On appeal, Silk Touch contends that the district court erred in sustaining Charles' objection to questioning regarding E. coli, and it should have been allowed to question Dr. Sorenson about E. coli and where it lives and inhabits the human body. Although the district court sustained Charles' initial objection, the record shows that Silk Touch was able to question Dr. Sorensen on the exact issues that it alleges the district court foreclosed. "The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." I.R.C.P. 61; *see also* I.R.E. 103(a). Silk Touch has not shown that the district court's ruling affected its substantial rights. Therefore, any alleged error committed by the district court was harmless.

5. <u>The district court did not abuse its discretion by allowing Charles to publish Dr. Kerr's response to interrogatory no. 22 to the jury.</u>

Charles alleged at trial that Silk Touch breached the applicable standard of care for disinfecting and sterilizing reusable medical equipment in part because Silk Touch did not soak the equipment in an enzymatic cleaner. During opening argument, Silk Touch's counsel stated: "[Dr. Kerr] uses a detergent that has a compound in it called enzymatic fluid that kills and sterilizes equipment. He uses that like he always has." Several times during trial, Charles

published Dr. Kerr's answer to interrogatory no. 22, in which Dr. Kerr did not mention using a detergent or enzymatic cleaner. Interrogatory no. 22 asked: "Please identify and describe each procedure, policy, and/or protocol for sterilization of each individual and/or piece of equipment which participated in or was used during the procedure on Kristal [sic] Ballard." Dr. Kerr's answer to interrogatory no. 22 reads:

> Sterilization of all equipment, including handpieces and cannulas. Handpiece and handpiece cord wiped down with bacteriostatic wipe. All other equipment rinsed of fluids and debris, washed in hot water and Hibiclens and rinsed in hot clean water. Hollow instruments and cannulas cleaned with brushes and flushed with Hibiclens solution. Instruments evenly spaced and placed in autoclave cassette. New thermal sterilization placed on outside of cassette. Instruments autoclaved in Statim autoclave. Individual instruments not placed in cassette are placed in autoclave pouches and run separately. Before use, sterilization markers are checked before opening cassette or opening autoclave packages.

The first time Charles sought to publish this interrogatory and answer, Silk Touch objected, stating that Charles had not disclosed prior to trial that he would be using this interrogatory. Charles argued that the interrogatory answer was admissible as a statement of a party and that he sought only to publish it to the jury rather than admit it as an exhibit. The district court overruled Silk Touch's objection and allowed Charles to publish interrogatory no. 22 and Dr. Kerr's answer.

On appeal, Silk Touch argues that the district court erred in allowing Charles to publish Dr. Kerr's answer to interrogatory no. 22 because it had not been submitted to the court before trial as required under Idaho Rule of Civil Procedure 33(b)(2).

> Idaho Rule of Civil Procedure 33(b) provides:
>
> (1) Interrogatories may relate to any matters which can be inquired into under Rule 26(b), and the answers may be used to the extent permitted by the Idaho Rules of Evidence.
> . . . .
> (2) If interrogatories and responses thereto are to be used at trial or are to be used either in support of, or in opposition to, a pretrial or post-trial motion, only those portions to be used shall be submitted to the court at the outset of the trial or at the filing of the motion or response thereto insofar as their use can be reasonably anticipated by the party seeking to introduce such evidence.

The parties agree that Charles did not submit Dr. Kerr's answer to interrogatory no. 22 to the court before trial. Silk Touch argues that because Rule 33(b)(2) states that the portion of interrogatories and responses to be used *shall* be submitted to the court at the outset of the trial, the district court was obligated to exclude Dr. Kerr's interrogatory answer. Charles argues that he

23

was not required to submit Dr. Kerr's interrogatory answer to the court because he had not anticipated introducing it until Silk Touch's counsel stated during opening argument that Dr. Kerr used a detergent with an enzymatic cleaner.

Idaho Rule of Civil Procedure 33(b)(1) specifically states that answers to interrogatories may be used at trial to the extent allowed under the Idaho Rules of Evidence. Rule 33(b)(2) provides that interrogatory answers shall be submitted to the court prior to trial "insofar as their use can be reasonably anticipated by the party seeking to introduce such evidence." I.R.C.P. 33(b)(2). The district court ruled that Dr. Kerr's answer to interrogatory no. 22 was admissible under the rules of evidence as a party admission. On appeal, Silk Touch does not challenge this conclusion. Rather, Silk Touch argues that 33(b)(2) acts as a bar to the introduction of interrogatory answers not submitted to the court prior to trial. However, by its plain language Rule 33(b)(2) only applies where the party could reasonably anticipate using the interrogatory response prior to trial.

On appeal, Silk Touch has provided no argument as to why Charles would have anticipated using Dr. Kerr's interrogatory response prior to trial. "[T]he burden is on the person asserting error to show an abuse of discretion." *Merrill v. Gibson*, 139 Idaho 840, 843, 87 P.3d 949, 952 (2004). Silk Touch has failed to provide argument as to why Rule 33(b)(2) would apply and bar the admission of Dr. Kerr's interrogatory answer in this case. A party cannot reasonably expect that an opponent will present evidence at trial that materially differs from the information it provided in response to discovery. Therefore, we conclude that Silk Touch failed to show that the district court abused its discretion in allowing Charles to publish Dr. Kerr's interrogatory answer.

6. The district court did not commit reversible error by allowing Dr. Sorensen to testify as to whether Dr. Kerr's interrogatory answer was consistent with his deposition testimony.

On direct examination of Dr. Sorensen, Charles' counsel read excerpts from Dr. Kerr's deposition and answer to interrogatory no. 22, which related to Silk Touch's procedures for disinfecting and sterilizing reusable medical equipment. Afterward, Charles' counsel asked Dr. Sorensen whether Dr. Kerr's interrogatory answer was consistent with his deposition testimony. Silk Touch objected on the basis that it called for a conclusion to be made by the jury. The district court overruled the objection stating that it was fair to allow the expert to comment on issues relevant to the standard of care, and that this was merely a preliminary point that the court

24

assumed would lead to another conclusion. After overruling Silk Touch's objection, the court instructed the jury that whether or not a statement is consistent is ultimately a question for the jury.

Dr. Sorenson testified that the interrogatory answer was consistent with Dr. Kerr's deposition testimony. Charles' counsel went on to ask Dr. Sorensen if Dr. Kerr mentioned using detergent or enzymatic cleaner when disinfecting and sterilizing reusable medical equipment in his answer to interrogatory no. 22. Dr. Sorensen stated that he did not, and concluded that the procedures Dr. Kerr outlined in his integratory answer did not meet the community standard of care for sterilizing medical equipment in 2010.

On appeal, Silk Touch argues that a comment on whether statements are consistent falls outside the limits of expert testimony under Idaho Rule of Evidence 702. Silk Touch contends that the question posed to Dr. Sorensen was not aimed at drawing upon his expertise, but rather simply asked him from a lay person perspective whether the testimony was consistent or not. Charles contends that testimony as to whether Dr. Kerr's interrogatory answer was consistent with his deposition testimony was relevant to whether Dr. Kerr breached the standard of care. Charles also argues that because the interrogatory and deposition utilized terms outside the scope of the average juror's experience, it was appropriate to have an expert explain how those responses were inconsistent with the use of an enzymatic cleaner.

Idaho Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"In general, expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702." *State v. Perry*, 139 Idaho 520, 525, 81 P.3d 1230, 1235 (2003) (quoting *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999)).

Charles is correct that Dr. Sorensen could provide testimony as to whether Silk Touch's procedures for disinfecting and sterilizing medical equipment, as articulated in Dr. Kerr's deposition and interrogatory answer, were consistent with the use of an enzymatic cleaner. Likewise, Dr. Sorensen could testify as to whether Dr. Kerr mentioned using a detergent or

enzymatic cleaner in either his interrogatory answer or deposition testimony. However, these were not the questions posed to Dr. Sorensen. The question at issue only asked Dr. Sorensen to determine whether Dr. Kerr's integratory answer was consistent with his deposition testimony, which did not require him to utilize his experience with procedures for disinfecting and sterilizing reusable medical equipment. Therefore, the district court erred in admitting such testimony.

However, any error was cured by the court's concurrent instruction that whether a statement is consistent is ultimately an issue for the jury. "Error in admission of evidence may be cured by proper instruction, and it must be presumed that the jury obeyed the trial court's direction." *Cook v. Skyline Corp.*, 135 Idaho 26, 32, 13 P.3d 857, 863 (2000) (quoting *State v. Tolman*, 121 Idaho 899, 905–06 n.6, 828 P.2d 1304, 1310–11 n.6 (1992)). "[O]nly where the evidence is highly prejudicial will no instruction cure the error of its admission." *Id.*

The admission of Dr. Sorensen's opinion as to whether Dr. Kerr's interrogatory answer was consistent with his deposition testimony was not highly prejudicial. As the district court recognized, this was merely a preliminary question introducing Dr. Sorenson's testimony that neither Dr. Kerr's deposition testimony nor interrogatory answer mentioned using an enzymatic cleaner. Accordingly, we hold that any error committed by the district court in allowing Dr. Sorensen's testimony was cured by the court's concurrent instruction.

7.  <u>The district court did not err in excluding Silk Touch's Exhibits MM and NN.</u>

On direct examination, Charles' counsel asked Dr. Sorensen about statements on his website concerning non-plastic surgeons performing certain types of liposuction. Dr. Sorensen testified that there had been an increase in physicians from different specialties performing liposuction with relatively little training. He further testified that as a result, his practice saw an increase in the number of patients coming to him to correct irregularities from liposuction procedures. Dr. Sorensen stated that this prompted him to put comments on his website, warning consumers seeking liposuction to make sure they see a provider who is qualified.

On cross-examination, Silk Touch's counsel asked Dr. Sorensen about his motive for putting the comments on his website. During this questioning, Silk Touch sought to admit printouts from Dr. Sorensen's website showing the comments at issue, Exhibits MM and NN. Charles objected to the admission of the exhibits on the basis that the exhibits had not been previously identified. The court sustained the objection, concluding that there was no basis to

admit extrinsic evidence on the issue when Dr. Sorensen had not disagreed with Silk Touch about the information on the website and that introduction of the evidence would be needlessly cumulative.

Outside the presence of the jury, Silk Touch made an offer of proof. Silk Touch argued that the exhibits demonstrated Dr. Sorensen was inherently biased against non-plastic surgeons who perform liposuction. Additionally, Silk Touch argued that the only time the jury had heard what the website said was in its opening statement, as Charles did not ask Dr. Sorensen what the website said on direct examination. In response the court stated:

> Dr. Sorensen testified that he did put on his website that he thought that liposuction should be done by plastic surgeons, and that there are problems, in essence, with non-plastic surgeons doing it, and so he said what his views were during his testimony. There's no provision under the Idaho Rules of Evidence to admit extrinsic evidence of a consistent statement. Under Idaho Rule of Evidence 613, extrinsic evidence is only admissible of [sic] inconsistent statements, and he already testified that he felt that plastic surgeons should do this process. And so there's no useful purpose served by it, and it's cumulative, and that's the basis of my ruling.

On appeal, Silk Touch alleges that the district court erred in ruling that exhibits MM and NN were needlessly cumulative of the testimony Dr. Sorensen offered on direct examination. However, Silk Touch does not challenge the district court's conclusion that the exhibits are not admissible because Idaho Rule of Evidence 613 only allows for admission of extrinsic evidence of prior inconsistent statements. "Where a lower court makes a ruling based on two alternative grounds and only one of those grounds is challenged on appeal, the appellate court must affirm on the uncontested basis." *Rich v. State*, 159 Idaho 553, 555, 364 P.3d 254, 256 (2015) (quoting *State v. Grazin*, 144 Idaho 510, 517–18, 164 P.3d 790, 797–98 (2007)). Silk Touch only challenged the district court's ruling that the evidence was cumulative, not the court's separate conclusion that the evidence should be excluded because the rules of evidence do not allow for the introduction of extrinsic evidence of a consistent statement. Therefore, we affirm the district court's exclusion of Exhibits MM and NN on the uncontested basis.

8. <u>The district court did not err in admitting Charles' Exhibit 5 and excluding Silk Touch's Exhibit H.</u>

At the beginning of the second trial, Charles sought to have certain exhibits admitted, including Exhibit 5. Exhibit 5 was Krystal's medical records and chart from Silk Touch. When introducing Exhibit 5, Charles' counsel explained: "It's been redacted in accordance with the

court's in limine rulings. It's been redacted in the same manner it was redacted and offered and admitted at the prior trial, so I just want to make that clear." Silk Touch did not object to the admission of Exhibit 5 at that time.

On the seventh day of trial, Silk Touch asked for clarifications on the court's in limine rulings, including the redactions in Exhibit 5. Silk Touch asserted that a paragraph was redacted from the operative report in Exhibit 5, which stated that Krystal agreed to have a friend who lives near her check on her regularly during the first 24 to 48 hours after the surgery. Silk Touch's counsel explained that testimony would be presented to show Krystal was told she needed to have someone take care of her during the first 24 to 48 hours after surgery, and he wanted to make sure that such testimony did not run afoul of the court's orders. During the course of this discussion, Silk Touch stated that the information should not have been redacted in Exhibit 5 and that Silk Touch had "an objection on the record that they should not be redacted as they have been." After a long discussion between the court and the parties as to the relevance of this testimony, the court concluded that Silk Touch could present testimony that Dr. Kerr instructed Krystal to have someone there to care for her for the first 24 to 48 hours.

On the tenth day of trial, Silk Touch sought to admit Defendant's Exhibit H, an unredacted copy of the medical records admitted as Exhibit 5. Silk Touch stated that the redacted material included a narrative prepared by Dr. Kerr about his telephone conversation with Krystal and Charles on July 24, 2016, and attempted phone calls to Krystal on July 25 and 26. The district court stated that it had previously ruled Dr. Kerr would be able to testify as to the phone conversation on July 24. The court continued:

> The only narrow portion of Exhibit 5 that I excluded were some speculations and explanations about -- that Dr. Kerr made about some of his concerns about her not telling the procedures -- talking about the procedure to her husband, which I think is neither here nor there. It's not relevant to any issue in this proceeding. It is already established in these proceedings that Charles Ballard returned to Mountain Home on July 23rd, 2010, that he was not present in the immediate post-surgery period, but there has been nothing but speculation that somehow that she engaged in some kind of improper self care.

The district court then denied admission of Exhibit H, concluding that the redacted information was not relevant and saying that the court would not revisit its prior ruling.

On appeal, Silk Touch alleges that the district court erred in admitting Exhibit 5 and excluding Exhibit H. Silk Touch alleges that the district court erred in admitting Exhibit 5 because the exhibit stated that it was a complete medical record, and the court's decision to

redact relevant information from the Silk Touch medical records cannot be sustained on relevancy. Charles argues that the Court should not consider Silk Touch's arguments because there is no indication on the record that Silk Touch timely objected to the admission of Exhibit 5. Additionally, Charles argues that the Court should decline to consider this issue because Silk Touch failed to include in the record on appeal the district court's ruling from the first trial redacting information in Exhibit 5.

As Charles argues, Silk Touch did not object to the admission of Exhibit 5 when offered and admitted as the second jury trial began. Silk Touch did not challenge the redactions during the second trial until seven days after Exhibit 5 was admitted, when it sought to introduce testimony regarding instructions Dr. Kerr gave to Krystal. Silk Touch alleged at that time that it had an objection on the record to the redactions. Additionally, the discussion indicated that the district court had previously ruled that certain information in the medical records should be redacted.

The redacted version of the medical records admitted as Exhibit 5 was the same exhibit admitted in the original trial. It appears that Silk Touch's objection to the redactions and the district court's ruling on that issue were made during the first trial. However, that objection and the district court's ruling were not included in the record on appeal. Under Idaho Rule of Evidence 103(a), error may not be predicated on a court's ruling admitting evidence unless "a timely objection or motion to strike appears of record." Additionally, "[t]he party appealing a decision of the district court bears the burden of ensuring that this Court is provided a sufficient record for review of the district court's decision." *Gibson v. Ada Cnty.*, 138 Idaho 787, 790, 69 P.3d 1048, 1051 (2003). "When a party appealing an issue presents an incomplete record, this Court will presume that the absent portion supports the findings of the district court." *Id.* Because the record on appeal does not include a timely objection to the admission of Exhibit 5 or the court's ruling on the redactions made to the medical records, we affirm the district court's admission of Exhibit 5 and exclusion of Exhibit H.

9. The district court did not err in excluding evidence of the lack of infection in other Silk Touch patients.

On September 16, 2013, Silk Touch submitted supplemental answers to Charles' interrogatory no. 20, which asked for the identity of each of Silk Touch's witnesses and a summary of each witness's expected testimony at trial. In the supplementation, Silk Touch stated for the first time that Susan Kerr would testify about records and data she compiled of infections

in other Silk Touch patients. This supplementation was served on Charles after the deadline for written discovery and depositions. In response, Charles wrote a letter to Silk Touch requesting the production of records and data relied on by Susan Kerr and sent notice of a reconvened deposition of Susan Kerr. Silk Touch responded by stating that the records and data were provided to Charles during the deposition of Silk Touch's expert Dr. Coffman. At his deposition on August 20, 2013, Dr. Coffman brought a file containing the names of Silk Touch patients, dates of treatment, and procedures performed (Ex. AA). During his deposition, Dr. Coffman testified that the list was compiling by Silk Touch and that he was not given any of the records or data relied on in compiling the list of patients or any information about the outcome for any of these patients. There is nothing in the record indicating that Silk Touch disclosed the records that were reviewed in developing Exhibit AA.

Prior to the first trial, Charles filed a motion in limine asking the district court to exclude any evidence of the lack of infection in other Silk Touch patients. Charles argued that the court should exclude any such evidence as it was not properly or seasonably disclosed. Additionally, Charles argued that the evidence should be excluded because the lack of infection in other patients is irrelevant to whether Silk Touch breached the standard of care as to Krystal.

The district court heard argument on the issue and granted Charles' motion. The court originally concluded that any evidence on this issue should be excluded because it was not relevant. Silk Touch argued that whether other patients at Silk Touch had infections was relevant because Dr. Sorensen had testified in his deposition that the best evidence of whether a facility was following proper sterilization techniques is the presence or absence of infections in other cases. The court then concluded that Silk Touch could revisit the issue later in trial, but it was a matter that needed to be addressed outside the presence of the jury. Directly following that discussion, Charles argued that regardless of whether the information was relevant, it should be excluded because it was not properly disclosed. The Court then stated:

> Well, in that case, I will definitely bar this in limine. And I will not revisit it, until we have a discussion outside the presence of the jury. And do not refer to it during opening statements. And we'll revisit it in its entirety, should the necessity arise. But the lack of disclosure of data underlying the summary presents a separate and considerably more serious problem.

The district court later declared a mistrial when Silk Touch's expert Dr. Stiller testified on direct examination that there was no history of other infections at Silk Touch. During the second trial, the district court revisited its ruling on several occasions, emphasizing that evidence

30

of the absence of infections in other patients was excluded both because it was not relevant and because the records and data relied on by Susan Kerr in developing Exhibit AA were not properly disclosed.

On appeal, Silk Touch alleges that the district court erred in excluding evidence of the absence of infections in other Silk Touch patients on the basis of relevancy. Specifically, Silk Touch contends that the evidence was relevant because Dr. Sorensen had testified in his deposition that the rate of surgical complications is the best evidence of whether a physician is engaging in proper cleaning, disinfecting, and sterilization of his instruments.

However, the record indicates that the district court excluded the evidence both on the basis that it was irrelevant and because the underlying data was not properly disclosed. In its opening brief, Silk Touch did not challenge the district court's conclusion that evidence regarding the lack of infections in other patients should be excluded because the underlying records and data were not properly disclosed. Accordingly, we affirm the district court's exclusion of evidence of the absence of infections in other patients on that basis. *See Rich v. State*, 159 Idaho 553, 555, 364 P.3d 254, 256 (2015).

## C. Whether the district court erred in its jury instructions.

"The propriety of jury instructions is a question of law over which this Court exercises free review." *Mackay v. Four Rivers Packing Co.*, 151 Idaho 388, 391, 257 P.3d 755, 758 (2011) (quoting *Clark v. Klein*, 137 Idaho 154, 156, 45 P.3d 810, 812 (2002)).When considering whether a jury instruction should or should not have been given, the Court considers "whether there is evidence at trial to support the instruction, and whether the instruction is a correct statement of the law." *Id.* "A requested jury instruction need not be given if it is either an erroneous statement of the law, adequately covered by other instructions, or not supported by the facts of the case." *Puckett v. Verska*, 144 Idaho 161, 167, 158 P.3d 937, 943 (2007) (quoting *Craig Johnson, LLC v. Floyd Town Architects, P.A.*, 142 Idaho 797, 800, 134 P.3d 648, 651 (2006)).

"Even where an instruction is erroneous, the error is not reversible unless the jury instructions taken as a whole mislead or prejudice a party." *Mackay*, 151 Idaho at 391, 257 P.3d at 758. "If the instructions fairly and adequately present the issues and state the law, no reversible error is committed." *Lakeland True Value Hardware, LLC v. Hartford Fire Ins. Co.*, 153 Idaho 716, 724, 291 P.3d 399, 407 (2012) (quoting *Robinson v. State Farm Mut. Auto. Ins.*

*Co.*, 137 Idaho 173, 176, 45 P.3d 829, 832 (2002)). Generally, an erroneous jury instruction does not justify granting a new trial "unless the appellant can establish that he or she was prejudiced thereby, and that the error affected the jury's conclusion." *Id.* (quoting *Robinson*, 137 Idaho at 176, 45 P.3d at 832). "Likewise, a special verdict form does not constitute reversible error unless it incorrectly instructed the jury as to the law or its form was confusing." *Mackay*, 151 Idaho at 391, 257 P.3d at 758.

1. The district court adequately instructed the jury on the applicable standard of care.

Silk Touch contends that the district court failed to properly instruct the jury on the applicable standard of care under Idaho Code section 6-1012 because it failed to give Silk Touch's proposed instructions 11, 12, 13 and 17. Silk Touch's proposed jury instructions read as follows:

Silk Touch's Requested Instruction 11

The Plaintiff has the burden of proving, by direct expert testimony and by a preponderance of all the competent evidence, that at the time and place of the incident in question Defendant Dr. Brian Kerr failed to meet the applicable standard of health care practice of the community in which such care was provided as such standard then existed with respect to the class of health care provider to which Defendant Dr. Brian Kerr belonged and in which he was functioning.

In addition, the Plaintiff has the burden of proving that the failure of Defendant Dr. Brian Kerr to meet the applicable standard of health care practice caused the injuries of the Plaintiff.

The Defendants have no burden of proof on any issue in the case.

Silk Touch's Requested Instruction 12

Individual providers of health care, such as Dr. Brian Kerr in this case, shall be judged in comparison with similarly trained and qualified providers of the same class in the same community, taking into account their training, experience, and fields of medical specialization.

Silk Touch's Requested Instruction 13

The standard of health care practice means the care typically provided under similar circumstances by the relevant type of health care provider in the community at the time and place of the events in question.

Silk Touch's Requested Instruction 17

As used in these instructions, the term "community" refers to that geographical area ordinarily served by the licensed general hospital where the medical care complained of was provided.

Rather than give Silk Touch's proposed instructions, the district court gave Instructions 8, 9, and 11:

> Instruction 8 [and 9][6]
>
> On his claim of medical negligence against Dr. Brian Calder Kerr for failure to meet the standard of care, the plaintiff has the burden of proof on each of the following propositions:
> 1.      That Dr. Kerr failed to meet the applicable standard of care as defined in these instructions;
> 2.      That the acts of Dr. Kerr, which failed to meet the applicable standard of care, were a proximate cause of the death of Krystal Ballard;
> 3.      That the plaintiff was injured by the death of Krystal Ballard; and
> 4.      The elements of damages and the amount thereof.
>
> Instruction 11
>
>        A health care provider undertaking the treatment or care of a patient has a duty to possess and exercise that degree of skill and learning ordinarily possessed and exercised by other health care providers who are trained and qualified in the same or a similar field of care who practice in the same community. It is further the duty of health care providers to use reasonable care and diligence in the exercise of their skill and the application of their learning.
>        Dr. Kerr and the defendants are health care providers within the meaning of this instruction.

Instructions 8, 9 and 11 are Idaho Jury Instructions ("IDJI") 2.10.2 and 2.10.3.

Silk Touch argues that the court erred in using the IDJI pattern instructions because Silk Touch's instructions better follow Idaho Code section 6-1012. In support of this argument, Silk Touch relies on several cases where this Court has held that a court's instructions adequately instruct the jury in a medical malpractice action where the instructions are based on section 6-1012. *See Morris v. Thomson*, 130 Idaho 138, 145, 937 P.2d 1212, 1219 (1997) ("We have consistently upheld instructions based upon § 6-1012 as correctly explaining to the jury the applicable standard of care."); *Hilden v. Ball*, 117 Idaho 314, 316, 787 P.2d 1122, 1124 (1989) (concluding that the district court did not err in its jury instructions where they were based on the local standard of care as enunciated in section 6-1012); *Robertson v. Richards*, 115 Idaho 628, 633, 769 P.2d 505, 510 (1987) ("I.C. § 6-1012 sets the applicable standard of care in Idaho medical malpractice cases, and the district court's instructions correctly apprise the jury that the defendant was required to meet that standard."); *Grimes v. Green*, 113 Idaho 519, 520, 746 P.2d

---

[6] Instruction 9 is the same as Instruction 8 except "Dr. Kerr" is replaced with "Silk Touch Laser, LLP."

33

978, 979 (1987) (holding that jury instructions were not erroneous when they substantially conformed to section 6-1012).

Silk Touch argues that its proposed jury instructions should have been used because they are virtually identical to those approved in *Robertson* and *Morris*. However, it is immaterial whether Silk Touch's jury instructions more closely follow section 6-1012 than the district court's instructions, so long as the given jury instructions fairly and adequately present the issues and state the law. The question before this Court is whether the district court's jury instructions, taken as a whole, accurately stated the requirements to prove a breach of the applicable standard of care in a medical malpractice action. *See Puckett*, 144 Idaho at 167, 158 P.3d at 943. The standard for proving whether a health practitioner breached the applicable standard of care is articulated in Idaho Code section 6-1012.

Idaho Code section 6-1012 provides in relevant part:

In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care . . . such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence of such physician and surgeon, hospital or other such health care provider and as such standard then and there existed with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning. Such individual providers of health care shall be judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any. If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered. As used in this act, the term "community" refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided.

Silk Touch argues that the district court erred in not including its proposed instructions 12 and 13. However, these instructions are substantially similar to the district court's Instruction 11, which provided that a health care practitioner has a "duty to possess and exercise that degree of skill and learning ordinarily possessed and exercised by other health care providers who are trained and qualified in the same or a similar field of care who practice in the same community." As we reiterated in *Puckett*, a requested jury instruction need not be given if it is adequately

34

covered by other instructions. 144 Idaho at 167, 158 P.3d at 943. Silk Touch's proposed instructions 12 and 13 are substantially the same as Instruction 11, and therefore, the district court did not err in refusing to include them in the jury instructions.

Silk Touch additionally argues that the district court committed reversible error by not adequately instructing the jury that Charles had to prove through direct expert testimony that Silk Touch breached the standard of care. Silk Touch argues that the court should have included its proposed instruction 11, which stated the plaintiff has the burden of proving, by direct expert testimony and by a preponderance of all the competent evidence, that the defendants breached the applicable standard of care. Additionally, Silk Touch argues that the error in not including this instruction was made worse by the court including Instruction 13:

> Instruction 13
>
> A witness who has special knowledge in a particular matter may give an opinion on that matter. In determining the weight to be given such opinion, you should consider the qualifications and credibility of the witness and the reasons given for his or her opinion. You are not bound by such opinion. Give it weight, if any, to which you deem it entitled.[7]

According to Silk Touch, Instruction 13 told the jury that it was not bound by the opinions of any expert witness, but none of the instructions informed the jury that it had to rule in Silk Touch's favor if it discounted Dr. Sorensen's opinion as to the applicable standard of care and whether it was breached.

Charles argues that the district court did not err by failing to instruct the jury that Charles had to prove Silk Touch breached the applicable standard of care through direct expert testimony because the court used the pattern instructions, which do not include such an instruction. Additionally, Charles argues that such an instruction was unnecessary in this case because the only evidence presented on the sterilization practices of providers with training similar to Dr. Kerr's was that of the respective experts of the parties. Charles also argues that the district court did not err in giving Instruction 13 because there is nothing inconsistent with the propositions

---

[7] Instruction 13 was patterned after former IDJI 124. Silk Touch argues that the fact that this instruction was not included after the revision indicates that it was disapproved of by the Court. This is not accurate. The introduction to the revised IDJI expressly states:

> A number of instructions included in the first edition of IDJI have been eliminated as too specialized, too particularized, or too remote for inclusion in a set of pattern instructions. This does not mean an earlier instruction is now disapproved; it means only that the topic is such that a manuscript instruction drafted expressly to cover the particular topic is more appropriate than an attempt to offer a pattern instruction.

Additionally, this instruction is still included in the criminal IDJI as IDJI 345.

that the standard of care must be proven by direct expert testimony and that the jury should decide whether to be bound by a particular expert's opinion, which may conflict with an opposing expert's opinion.

The district court used IDJI instruction 2.10.2 to instruct the jury on the applicable standard of care, which does not include language that the standard of care must be proven by direct expert testimony. Idaho Rule of Civil Procedure 51(a)(2) provides:

> Whenever the latest edition of Idaho Jury Instructions (IDJI) contains an instruction applicable to a case and the trial judge determines that the jury should be instructed on the subject, it is recommended that the judge use the IDJI instruction unless the judge finds that a different instruction would more adequately, accurately or clearly state the law. Whenever the latest edition of IDJI does not contain an instruction on a subject upon which the trial judge determines that the jury should be instructed, or when an IDJI instruction cannot be modified to submit the issue properly, the instruction given on that subject should be simple, brief, impartial and free from argument.

Silk Touch argues that the fact that the IDJI does not include an instruction stating that the standard of care must be proven by direct expert testimony is not dispositive of whether the district court erred by not including such an instruction. Silk Touch relies on *Leazer v. Kiefer*, where this Court held that a district court committed reversible error by instructing a jury that "a physician is not negligent if, in exercising his best judgment, he selects one of the approved methods which later turns out to be a wrong selection or one not favored by certain other practitioners." 120 Idaho 902, 905, 821 P.2d 957, 960 (1991). There, the Court reasoned that this jury instruction was based on the standard of care applied in medical malpractice actions before the enactment of Idaho Code section 6-1012. *Id*. The Court concluded that the best judgment language in the instruction, which was also incorporated into former IDJI 205, did not conform to the requirements of section 6-1012 and "[t]he passage of I.C. § 6-1012 has required new jury instructions dealing with the standard of care." *Id.* at 906, 821 P.2d at 961.

The holding in *Leazer* is not applicable to this case. There, the pattern jury instruction had been developed before the enactment of section 6-1012, and the Court held that the passage of that law required new jury instructions. The current IDJIs were adopted in 2003, and IDJI 2.10.2 was drafted to set forth the standard articulated in 6-1012.

The failure to include an instruction that Charles had to prove Silk Touch breached the applicable standard of care through direct expert testimony was not reversible error. The district court included Instructions 8 and 9, which specifically instructed the jury that Charles had the

burden of proving that Dr. Kerr and Silk Touch breached the applicable standard of care. Additionally, the court included Instruction 7, which instructed the jury that where a party bears the burden of proof it means that the jury must be persuaded that the proposition is more probably true than not. In the present case, the only evidence Charles presented on the applicable standard of care was Dr. Sorenson's testimony. Although Instruction 13 stated that the jury was not bound by the opinion of any one expert, read together with instructions 7, 8, and 9, the jury could not discount Dr. Sorenson's testimony and still find that Charles' had proven by a preponderance of the evidence that Silk Touch breached the standard of care. Reading the instructions as a whole, they adequately apprised the jury of Charles' burden of proof under section 6-1012.

Silk Touch also contends that the district court erred in not giving Silk Touch's proposed instruction 17 because it provided the definition of "community," which was not otherwise defined in the court's jury instructions. Charles argues that such an instruction was unnecessary in this case because all the evidence presented was based on the standard of care in the Boise area. According to Charles, the jury was not asked to determine the applicable community so the district court did not err by refusing to include Silk Touch's proposed instruction 17.

Silk Touch argues extensively on appeal that the applicable community was Eagle, not the greater Boise area. However, as Charles argues, Silk Touch did not present any evidence during trial on how the standard of care in Eagle was different from that in the greater Boise area. In fact, Silk Touch's own experts, who did not practice in Eagle, stated they became familiar with the applicable standard of care by talking with Dr. O'Neil, a family physician who practiced cosmetic surgery in the Boise area. All of the evidence presented at trial was based on the applicable community being the greater Boise area. There was no factual determination to be made by the jury on this issue. Therefore, the district court did not err in refusing to include Silk Touch's proposed instruction 17.

The district court utilized the pattern jury instructions for a medical malpractice action. These instructions do not include the language from section 6-1012 stating the plaintiff must prove the standard of care through direct expert testimony, or the language defining "community." It makes sense that the IDJI do not include such instructions. Whether a plaintiff provided direct, competent expert testimony to prove the applicable standard of care, and whether the expert was familiar with the standard of care in a particular community, are

foundational questions to be resolved by a judge in determining whether expert testimony is admissible. Usually, the only evidence of the standard of care presented will be expert testimony, and the court will have resolved any dispute as to the applicable community prior to trial. As this case demonstrates, these are generally not issues for a jury to resolve, and those instructions would therefore not be necessary in the majority of medical malpractice cases.

We hold that the jury instructions adequately instructed the jury on the applicable standard of care.

2. The district court did not err in giving Instruction 5.

On appeal, Silk Touch contends that the district court committed reversible error by giving Instruction 5, which explained the difference between direct and circumstantial evidence. Instruction 5 read as follows:

Instruction 5

Evidence may be either direct or circumstantial. Direct evidence is evidence that directly proves a fact. Circumstantial evidence is evidence that indirectly proves the fact, by proving one or more facts from which the fact at issue may be inferred. For example, if you see it snowing, you have direct evidence that it has snowed. If you don't see it snowing but wake up and find the ground is covered in snow, then you have circumstantial evidence that it snowed.

The law makes no distinction between direct and circumstantial evidence as to the degree of proof required; each is accepted as a reasonable method of proof and each is respected for such convincing force as it may carry.

This instruction is a modified version of IDJI 1.24.2.

Silk Touch takes issue with the district court's snow illustration, which is not included in the pattern instruction. Silk Touch alleges that the example misstates the law because it allows the jury to conclude that since Dr. Kerr operated on Krystal's buttock and bacteria was later found there, it must have been introduced during the procedure. Silk Touch's argument that Instruction 5 should not have been given is part and parcel with its argument that Charles failed to prove proximate cause because he did not present direct evidence showing that the instruments used in Krystal's procedure were contaminated or that the bacteria found in Krystal were introduced during the procedure. As discussed above, proximate cause may be proven by direct evidence or by showing a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. *Weeks v. E. Idaho Health Servs*, 143 Idaho 834, 839, 153 P.3d 1180, 1185 (2007) (quoting *Sheridan v. St. Luke's Reg'l Med. Ctr.*, 135 Idaho 775,

785, 25 P.3d 88, 98 (2001)). Under the law, Charles could rely on circumstantial evidence to establish proximate cause.

The district court did not misstate the law by including the snow illustration in Instruction 5. The district court concluded that the snow illustration was generally helpful to a jury who may glaze over when instructions use "philosophy major verbiage." As Charles argues, although this Court has not specifically approved of the "snow illustration" to aid the jury in understanding circumstantial evidence, other courts have. *See State v. Cipriano*, 21 A.3d 408, 424–25 (R.I. 2011); *Thomas v. State*, 350 S.E.2d 253, 254 (Ga. App. 1986). As the Georgia Court of Appeals concluded, such an illustration could aid the jury in distinguishing direct from circumstantial evidence. *Thomas*, 350 S.E.2d at 254. We agree. The snow illustration provides a real-world example of the difference between direct and circumstantial evidence, which can aid the jury in understanding an otherwise difficult concept. We hold that the district court did not err in giving Instruction 5.

3. The district court did not err in giving Instruction 10.

Silk Touch alleges that the district court erred in including Instruction 10, defining negligence, because it is irrelevant in a medical malpractice action where the applicable standard of care is defined by statute. Instruction 10 read as follows:

Instruction 10

When I use the word "negligence" in these instructions, I mean the failure to use ordinary care in the management of one's property or person. The words "ordinary care" mean the care a reasonably careful person would use under circumstances similar to those shown by the evidence. Negligence may thus consist of the failure to do something which a reasonably careful person would do, or the doing of something a reasonably careful person would not do, under circumstances similar to those shown by the evidence.

This instruction is IDJI 2.20. Silk Touch alleges the inclusion of Instruction 10 confused the jury because it conveys a completely different standard of duty than that conveyed in Instruction 11. The district court concluded that a definition of negligence should be included because IDJI 2.10.3, included as Instructions 8 and 9, uses the phrase "medical negligence" when setting forth the elements of a medical malpractice claim.

As Charles argues, the commentary to IDJI 2.20 suggests that the definition of general negligence is meant to be given in conjunction with IDJI 2.10.2.

IDJI 2.20 provides:

39

When I use the word "negligence" in these instructions, I mean the failure to use ordinary care in the management of one's property or person. The words "ordinary care" mean the care a reasonably careful person would use under circumstances similar to those shown by the evidence. Negligence may thus consist of the failure to do something which a reasonably careful person would do, or the doing of something a reasonably careful person would not do, under circumstances similar to those shown by the evidence. [The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide.]

The commentary to this instruction provides that "[t]he bracketed words may be omitted when specific instructions defining the standard of care, such as statutory duties, are included." The district court included IDJI 2.20 without the bracketed language and included IDJI 2.10.2 [Instruction 11] which provided the standard of care for medical providers. Instruction 11 does not provide a conflicting standard to Instruction 10, but rather, provides additional information as to what ordinary care means in the medical malpractice context. We hold that the district court did not err in including Instruction 10.

4. The district court did not err in submitting the issue of recklessness to the jury.

Silk Touch alleges that the district court erred in including Instruction 18 and Question 3 on the special verdict form because there was no direct expert testimony presented at trial to establish that Silk Touch acted recklessly. Charles argues that direct expert testimony is not required to establish recklessness and that there was sufficient evidence in the record to warrant submitting the issue of recklessness to the jury.

Instruction 18 read as follows:

Instruction 18

Willful or reckless misconduct, when used in these instructions and when applied to the allegations in this case, means more than ordinary negligence. Willful or reckless misconduct means intentional or reckless actions, taken under circumstances where the actor knew or should have known not only that his actions created an unreasonable risk of harm to another, but also that his actions involved a high degree of probability that such harm would actually result.[8]

The special verdict form directed the jury to answer Question 3 only if the jury had concluded that either Dr. Kerr or Silk Touch breached the standard of care and that such breach was the proximate cause of Krystal's death. Question 3 asked: "were the actions of the defendant(s) which breached the standard of care and were the proximate cause of Krystal Ballard's death,

---

[8] This instruction is a modified version of IDJI 2.25.

reckless?" The jury concluded that both Dr. Kerr and Silk Touch breached the standard of care and that such breach was the proximate cause of Krystal's death. The jury further found that the defendants acted recklessly and awarded Charles $2,540,436 in economic damages and $1,250,000 in non-economic damages.

Silk Touch does not allege that Instruction 18 misstated the law or that the jury did not have substantial evidence to support a finding of recklessness. Rather, Silk Touch limits its argument to whether the issue of recklessness can be submitted to the jury in a medical malpractice action without direct expert testimony establishing that the defendant's conduct rose to that level.

Silk Touch argues that this Court's decision in *Jones v. Crawforth*, 147 Idaho 11, 205 P.3d 660 (2009), necessitates a finding that direct expert testimony is required to prove recklessness in a medical malpractice action. In *Jones*, we ruled that a district court did not abuse its discretion in allowing expert witnesses to offer opinions as to whether the defendant's conduct was reckless in a medical malpractice action. 147 Idaho at 17–18, 205 P.3d at 666–67. We reasoned that the testimony was permissible because:

> (1) the experts had acquainted themselves adequately with the community standard for health care providers such as Kurtz, and (2) their opinions as to the level of negligence of her conduct were not conclusions that the average juror would be qualified to draw. Idaho Code § 6–1012 requires expert testimony to prove that a health care provider is negligent; therefore, the testimony of Dr. Benum and Ms. Heller is precisely what the statute contemplates.

*Id.* at 17, 205 P.3d at 666. Silk Touch argues that *Jones* recognized that whether a medical provider's conduct was reckless is usually a matter outside the experience of a layperson and expert testimony should therefore be required. Additionally, Silk Touch argues that because expert testimony is required to prove negligence in a medical practice action, it must also be required to prove recklessness or else plaintiffs could avoid the requirements of Idaho Code sections 6-1012 and 6-1013 by only asserting recklessness claims.

Idaho Code section 6-1603(1) provides: "In no action seeking damages for personal injury, including death, shall a judgment for noneconomic damages be entered for a claimant exceeding the maximum amount of two hundred fifty thousand dollars ($250,000)."[9] However, this cap on awards of non-economic damages shall not apply to "[c]auses of action arising out of

---

[9] This cap is adjusted annually according to the percentage of Idaho Industrial Commission adjustments to the average annual wage, computed pursuant to Idaho Code section 72-409(2). I.C. § 6-1603(1).

willful or reckless misconduct." I.C. § 6-1603(4)(a). In *Carrillo v. Boise Tire Co., Inc.*, we reiterated the standard for proving recklessness:

> Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency in that reckless misconduct requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent.

152 Idaho 741, 751, 274 P.3d 1256, 1266 (2012) (quoting *State v. Papse*, 83 Idaho 358, 362–63, 362 P.2d 1083, 1086 (1961)). In *Hennefer v. Blaine Cnty. Sch. Dist.*, this Court concluded that whether a defendant acted recklessly is based on an objective standard: "Though the actor must make a conscious choice as to his or her course of action, the actor need not subjectively be actually aware of the risk or the high probability that harm will result." 158 Idaho 242, 249, 346 P.3d 259, 266 (2015). As we further stated: "It is sufficient for a finding of recklessness that the actor makes the choice as to his or her course of conduct under circumstances where the risk and high probability of harm are objectively foreseeable." *Id.*

Although section 6-1012 requires that the applicable standard of care and the defendant's breach thereof be proven by direct expert testimony, there is no requirement that a plaintiff provide expert testimony to prove recklessness. In *Jones*, we held that expert opinions on whether a defendant's conduct was reckless were admissible where "(1) the experts had acquainted themselves adequately with the community standard for health care providers such as Kurtz, and (2) their opinions as to the level of negligence of her conduct were not conclusions that the average juror would be qualified to draw." 147 Idaho at 17, 205 P.3d at 666. Silk Touch focuses on the language in *Jones* stating that because section 6-1012 requires expert testimony to prove a health care provider is negligent, the testimony provided by the experts in that case was precisely what the statute contemplates. *Id.* However, the Court found that "it was the opinions of the experts regarding the community standard of care that was the focus of the testimony." *Id.* There, this Court did not conclude that section 6-1012 required expert testimony to prove

recklessness in every case, but that expert opinions as to the level of negligence could assist the jury in some cases.

Where the legislature has intended that a heightened standard of proof or a specific method of proof apply, it has expressly provided for such a requirement. For example, the legislature has required that a claimant seeking punitive damages "prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." I.C. § 6-1604. Likewise, the legislature expressly provided that the standard of care and breach of that standard be proven by direct expert testimony in a medical malpractice action. I.C. § 6-1012. Idaho Code section 6-1603 provides that the cap on awards of non-economic damages shall not apply to causes of action arising out of reckless misconduct, but is silent on the method of proof required to show recklessness. Likewise, section 6-1012 is silent on the issue of recklessness. Where the legislature has not expressly provided that direct expert testimony is required to prove recklessness in medical malpractice actions, we decline to apply such a requirement.

Once an expert has opined as to the applicable standard of care and how a defendant's conduct breached that standard, in many cases a lay person could determine whether a defendant made a conscious choice to engage in such conduct and whether the risk and high probability of harm were objectively foreseeable. Silk Touch's argument that not requiring direct expert testimony to prove recklessness would allow plaintiffs to run around the requirements of section 6-1012 is unavailing. The jury could only find that Silk Touch's conduct was reckless once it determined that Silk Touch had breached the applicable standard of care and that the breach was the proximate cause of Krystal's death. In a medical malpractice action, a finding of recklessness cannot be made unless a plaintiff first proves that a defendant breached the standard of care as defined in section 6-1012.

"Litigants have a right to have the jury instructed on every reasonable theory presenting a basis of a claim or relief, or defense thereto, where such theory finds support in the pleadings and evidence. *Garrett Freightlines, Inc. v. Bannock Paving Co.*, *Inc.*, 112 Idaho 722, 730–31, 735 P.2d 1033, 1041–42 (1987). In the present case, there was evidence on the record supporting a theory that Silk Touch's conduct was reckless. Testimony from Dr. Kerr's deposition was presented, where Dr. Kerr stated that he did not soak reusable medical equipment in an enzymatic cleaner before placing the equipment in the autoclave. Additionally, Dr. Kerr and

Briana Dumas both testified that they knew that biological indicators were not used in the autoclave. Dr. Sorensen presented testimony that the use of biological indicators and an enzymatic cleaner were recommended by the CDC. Additionally, the manufacturer's guidelines for the Vaser handpiece, which were in the possession of Dr. Kerr, also stated that the handpiece should be soaked in an enzymatic cleaner. Dr. Sorensen testified that failing to use an enzymatic cleaner increased the risk that proteinaceous debris could insulate bacteria from being killed during the steam sterilization process in the autoclave. Additionally, Dr. Sorensen testified that biological indicators were the only way to test whether an autoclave was actually killing bacteria. This testimony provides evidence to support a theory that Silk Touch made a conscious choice not to use enzymatic cleaners and biological indicators and that Silk Touch should have known that such failure presented a high probability that not all bacteria would be removed from equipment during the sterilization process. It is objectively foreseeable that the use of improper sterilization procedures created a high probability that bacteria would be introduced in patients and cause infection.

Accordingly, we hold that the district court did not err in submitting the issue of recklessness to the jury.

**D. Whether the district court's judgment should be reversed because the court made improper comments on the evidence.**

Silk Touch alleges that the district court made several improper comments on the evidence during trial. However, Silk Touch does not point to any objections made on the record, and review of the trial transcript reveals no objections to the comments Silk Touch alleges are prejudicial. This Court has specifically held that where a party fails to object to allegedly prejudicial comments made by the trial judge, that issue is normally waived on appeal. *State v. Yakovac*, 145 Idaho 437, 442, 180 P.3d 476, 481 (2008). Where no objection was made, the Court will only review for fundamental errors—errors that "go[] to the foundation or basis of a defendant's rights." *Id.* However, the fundamental error analysis does not apply in civil cases. *Gordon v. Hedrick*, 159 Idaho 604, 612–13, 364 P.3d 951, 959–60 (2015) ("The fundamental error doctrine does not apply in this case. This is a civil case and the doctrine applies to all claims of error relating to proceedings in *criminal* cases in the trial courts.") (internal quotation marks omitted). Therefore, we hold that Silk Touch waived its argument on appeal because it failed to object to the allegedly prejudicial comments at trial.

Although Silk Touch waived its argument on this issue, it is appropriate to remark on certain comments made at trial by the district court. During trial, Silk Touch's counsel objected on the basis of relevancy to several questions presented to Dr. Kerr concerning his duty to sterilize reusable medical equipment. When overruling such objections, the district court several times commented that this line of questioning was "very relevant" or "highly relevant." Such comments are not necessary to ruling on an objection, and categorizing specific information as "highly relevant" or "very relevant" in certain cases could qualify as comments on the weight of the evidence, which has the potential to prejudice parties because such comments could tend to influence the jurors. *See State v. White*, 97 Idaho 708, 711, 551 P.2d 1344, 1347 (1976). We do not reach the issue of whether these comments were prejudicial in this case because Silk Touch failed to object to these comments at trial. However, we admonish trial courts to avoid making such superfluous comments when ruling on objections.

**E.  Whether the district court abused its discretion in permitting juror questions.**

Before opening arguments in the second trial, Charles had requested that the district court allow juror questions during trial. Silk Touch objected. The district court ruled that it would allow juror questions, concluding that it had allowed juror questions in the past and found jurors seemed to be more focused and engaged in those instances. The district court then went on to explain to counsel the procedure that would be followed.

Specifically, the court stated that after redirect examination of each witness the court would ask the jurors to write down any questions they had. The questions would then be reviewed by the court and counsel during a sidebar and counsel could mark any objections on the specific questions. After review, the court would read questions to the witnesses, and after the juror questions were asked, each side would have an opportunity to ask follow-up questions. The court also specifically stated that meritorious objections to the juror questions could be made, such as objections based on hearsay or relevance. However, the court stated that objections to the form of the questions would not be proper because the court would rephrase questions as necessary to avoid those issues.

Throughout trial, the district court asked the jurors if they had any questions after rebuttal examination of each witness. Of the twelve witnesses, the jurors submitted questions to ten. The jurors submitted a total of ninety-three questions to the court, and each party had an opportunity during a sidebar to review the questions and mark any objections. As the district court noted, it

45

appears that Silk Touch objected to every question submitted by the jurors by noting "objection" on each individual question.

Idaho Rule of Civil Procedure 47(q) provides:

> In the discretion of the court, jurors may be instructed that they are individually permitted to submit to the court a written question directed to any witness. If questions are submitted, the parties or counsel shall be given the opportunity to object to such questions outside the presence of the jury. If the questions are not objectionable, the court shall read the question to the witness. The parties or counsel may then be given the opportunity to ask follow-up questions as necessary.

This Court has yet to address Rule 47(q) and the scope of the district court's discretion to permit juror questions in a judicial opinion.

In *State v. Doleszny*, the Supreme Court of Vermont surveyed state and federal court decisions, scholarly articles, and commission reports addressing whether juror questioning should be allowed in some form. 844 A.2d 773 (Vt. 2004). As the court described, "[t]he vast majority of states that have ruled on the issue allow juror questioning in some form," and "of the ten federal circuits that have considered the juror questioning issue, all allow the practice in some form in the trial court's discretion." *Id.* at 778–79. Additionally, "[m]any states have established jury policy commissions to study methods of improving juror understanding of the evidence and proceedings," and "[t]hese commissions have overwhelmingly supported adoption of policies that allow juror questioning of witnesses at least in some cases." *Id.* at 780. As the court in *Doleszny* further articulated, these reports led to several states, including Idaho, enacting rules that allow juror questioning of witnesses and that specify the procedures to be followed. *Id.* at 781.

Since this practice has been adopted, several courts have emphasized the advantages of allowing jurors to submit questions, including "(1) increased juror attentiveness; (2) the potential for jurors to more completely comprehend the evidence; (3) the opportunity for trial attorneys to better understand the jurors' thought processes and their perception of the case weaknesses; and (4) greater juror satisfaction regarding their role at trial." *Flores v. State*, 965 P.2d 901, 902 (Nev. 1998), *as amended* (Feb. 4, 1999); *see also United States v. Rawlings*, 522 F.3d 403, 407 (D.C. Cir. 2008); *Ex parte Malone*, 12 So. 3d 60, 64 (Ala. 2008); *Medina v. People*, 114 P.3d 845, 852 (Colo. 2005); *State v. Fisher*, 789 N.E.2d 222, 228–29 (Ohio 2003); *Yeager v. Greene*, 502 A.2d 980, 998–1000 (D.C. 1985). However, a few states have barred the practice of

allowing juror questions, fearing that "juror questioning has the potential of disrupting the neutral role that jurors play in the adversarial system of justice." *Medina*, 114 P.3d at 852. Even courts that allow juror questions have noted that the practice carries some risk, and most jurisdictions that allow juror questions only do so where certain procedural safeguards are employed. *See, e.g., Malone*, 12 So. 3d at 66 n.5; *Fisher*, 789 N.E.2d at 227; *Commonwealth v. Britto*, 744 N.E.2d 1089, 1105–06 (Mass. 2001); *Flores*, 965 P.2d at 902–03; *Handy v. State*, 30 A.3d 197, 218 (Md. Ct. Spec. App. 2011).

Like most jurisdictions, Idaho has adopted the approach of allowing juror questions under the trial court's discretion but pursuant to certain procedural safeguards. Under Idaho Rule of Civil Procedure 47(q), the district court has discretion to permit juror questions. The Rule further provides that where juror questions are permitted: (1) the court should instruct jurors that questions should be submitted to the court in writing, (2) counsel should be given an opportunity to object to such questions outside the presence of the jury, (3) the court shall read the question to the witness, and (4) the parties or counsel should be given the opportunity to ask follow-up questions as necessary. I.R.C.P. 47(q).

Silk Touch alleges that the district court did not provide sufficient safeguards when permitting jury instructions because (1) the court solicited over 90 juror questions; (2) counsel was not allowed to object outside the presence of the jury, except through writing objections on the juror questions; and (3) the court rephrased some of the jurors' questions when reading them to witnesses. Silk Touch also challenges some of the specific juror questions read by the court, alleging that the questions were improper under the Idaho Rules of Evidence.

Before addressing the individual arguments on appeal, we set forth the applicable standard of review. Both parties agree that the appropriate standard for review is the standard of review applied to evidentiary rulings. We agree. As the Colorado Supreme Court reasoned, a district court's decision to permit a juror question is an evidentiary decision:

> Juror questions which are submitted through the court, like those of counsel or the trial judge, either adduce additional evidence, or challenge the strength of existing testimony. A juror's question which is wrongfully introduced into the trial process can have its impact and that of the answer assessed on appellate review. Thus, in instances where an otherwise impermissible question from a juror is asked by the trial court, the harmful result to the defendant from that question would be the introduction of otherwise inadmissible evidence.

*Medina*, 114 P.3d at 858.

47

Under this standard, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless the ruling is a manifest abuse of the trial court's discretion and a substantial right of the party is affected." *Van v. Portneuf Med. Ctr., Inc.*, 156 Idaho 696, 701, 330 P.3d 1054, 1059 (2014); *see also* I.R.E. 103(a); I.R.C.P. 61. Additionally, under Idaho Rule of Evidence 103(a), error may not be predicated upon a ruling that admits evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context."

1. The district court did not abuse its discretion by permitting juror questions because it had sufficient procedural safeguards in place.

Silk Touch first argues that the district court abused its discretion by soliciting questions from jurors after rebuttal testimony from each witness. Silk Touch relies on *United States v. Ajmal*, where the Second Circuit ruled that a district court abused its discretion by allowing an excessive number of juror questions. 67 F.3d 12, 14–15 (2d Cir. 1995). In *Ajmal*, the district court allowed juror questions in a criminal action for a drug conspiracy. *Id.* at 13. As each witness's testimony concluded, the district court asked the jury if they had any questions and, after screening, read the questions which it deemed permissible. *Id.* The Second Circuit found that "[t]he jury took extensive advantage of the opportunity to ask questions of the witnesses," and "the district court allowed the jurors to continue questioning witnesses throughout the trial as a matter of course." *Id.* The Second Circuit concluded that although juror questioning is a permissible practice within the district court's discretion, it should only be allowed under extraordinary or compelling circumstances. *Id.* at 14. The court then reiterated the dangers inherent in allowing juror questions as a matter of course, including (1) removing the juror from his or her role as a neutral fact-finder; (2) risking that the juror would prematurely evaluate the evidence and adopt a position before considering all of the facts; (3) delaying the pace of trial and undermining litigation strategies; and (4) creating awkwardness for lawyers who wish to object. *Id.* The court also concluded that the risk of prejudice from excessive juror questioning is particularly high in a criminal proceeding where the jurors were allowed to question the defendant. *Id.* Overall, the Second Circuit concluded that juror questions were not appropriate where the case was not factually complicated and where juror questions were not prompted by the urging of the jurors themselves. *Id.*

Two state courts have more recently addressed the issue of whether a district court abused its discretion by soliciting juror questions. In *Britto*, the Massachusetts Supreme Judicial

Court addressed whether a district court abused its discretion in allowing over ninety juror questions to be submitted during a murder trial. 744 N.E.2d at 1103. The court stated that although soliciting questions from jurors has the potential for introducing prejudice, delay, and error into the trial, such prejudice would not be presumed. *Id.* at 1104–05. The court concluded that there was no reversible error because the defendant failed to show that the proceeding had been prejudiced by the court soliciting juror questions. *Id.* at 1105.

In *Malone*, the Supreme Court of Alabama held that a court's solicitation of questions from jurors during a murder trial was not grounds for reversal. 12 So. 3d at 66. In that case, the court asked the jurors if they had any questions at the conclusion of each witness's testimony. *Id.* at 62. Unlike the present case, the court in *Malone* allowed the jurors to ask their questions directly. *Id.* In total, the jurors in *Malone* asked eight questions of five witnesses. *Id.* The defendant appealed, arguing that the trial court exceeded its discretion by actively soliciting questions from the jurors at the conclusion of each witness's testimony. *Id.* at 63. The Alabama court held that a district court inviting questions by jurors does not in and of itself constitute error. *Id.* at 65. The court reasoned:

> The fact that the trial court granted the jurors permission to ask questions of witnesses without any special request from them for this privilege does not, in our opinion, in and of itself constitute error. The determining factors as to whether error has been committed is the type of questions asked and allowed to be answered. If the questions asked are not germane to the issues involved or are such as would be clearly improper and therefore prejudicial to the rights of the defendants to a fair and impartial trial, the court's allowing them to be answered would be error.

*Id.* (quoting *State v. Anderson*, 108 Utah 130, 133, 158 P.2d 127, 128 (1945)). Although the court ruled that soliciting juror questions by itself was not reversible error, the court emphasized that it agreed with the Second Circuit that there are inherent dangers in the process and that it is important that the trial court adopt practices to protect a defendant's rights. *Id.* at 66.

We agree with the holdings in *Britto* and *Malone*, and conclude that the solicitation of a large number of juror questions, by itself, is not reversible error. Idaho Rule of Civil Procedure 47(q) does not prohibit a court from soliciting questions from jurors. To the contrary, the language of Rule 47(q) suggests that the court may decide to permit juror questions without any special request made by the jurors: "In the discretion of the court, jurors may be instructed that they are individually permitted to submit to the court a written question directed to any witness."

49

The Rule also does not require that the court limit the number of juror questions or imply that juror questions should be limited to certain types of cases.

Additionally, several of the "risks" associated with juror questions that the Second Circuit articulated in *Ajmal* have been disproven by empirical studies. As discussed at length in *Doleszny*, empirical studies have evaluated the effect of allowing juror questions in both criminal and civil trials. 844 A.2d at 784. As relevant here, these studies found: (1) jurors allowed to ask questions do not become advocates rather than neutrals; (2) jurors were not embarrassed or angry when the judge did not ask their questions; and (3) jurors asked appropriate questions. *Id.* (citing Nicole L. Mott, *The Current Debate on Juror Questions: "To Ask or Not to Ask, That Is the Question,"* 78 CHI.-KENT L. REV. 1099 (2003); Steven Penrod & Larry Heuer, *Tweaking Commonsense: Assessing Aids to Jury Decision Making*, 3 PSYCHOL. PUB. POL'Y & L. 259 (1997); Larry Heuer & Steven Penrod, *Juror Notetaking and Question Asking During Trials: A National Field Experiment*, 18 LAW & HUM. BEHAV. 121 (1994)).

Because studies have shown many of these risks to be based on speculation rather than empirical evidence, we agree with the reasoning in *Britto* and conclude that prejudice will not be presumed merely because jurors were permitted to ask a significant number of questions. We also agree with the reasoning in *Malone* and conclude that the relevant factors to determine whether the district court abused its discretion in permitting jury questions are the types of questions the court allowed to be asked and whether the court employed sufficient procedural safeguards. To establish reversible error, Silk Touch needs to show that the questions asked were improper or that the court did not provide sufficient procedural safeguards. Additionally, if Silk Touch proves that the district court erred, it must show that the error was not harmless.

Silk Touch argues that the district court did not employ sufficient procedural safeguards because counsel was not given an opportunity to object to the questions on the record and the jurors were able to submit questions regardless of their relevance or significance to the issues in the case. As Charles argues, counsel was given an opportunity to object to juror questions outside the presence of the jury as required under Rule 47(q). Silk Touch had an opportunity to make a record of its objections through writing its objections on the specific questions. Additionally, throughout trial, counsel could have asked the court to lodge an objection on the record. Counsel was allowed to make offers of proof and elaborate on objections to the court's

rulings on the record before the jury was seated in the morning and during afternoon and evening recesses.

As Charles points out, during one of these recesses, the district court noted that Silk Touch had objected to every single juror question by marking each with "objection." The court also stated its reason for not reading two of the questions and noted that the questions, including counsel's notes, are kept for the record. Silk Touch had an opportunity to address the court and elaborate on its objections to ensure that its objections were properly preserved for appeal. It appears that Silk Touch is arguing that in order to meet the requirements of Rule 47(q), the district court was required to dismiss the jury after questions were submitted and hold a hearing so counsel could put its objections on the record. However, this process would cause significant delay in the trial process. The district court discussed the juror questions during sidebar conferences and allowed counsel to mark objections on the questions. Additionally, Silk Touch's counsel had ample opportunity to ask the court to allow specific objections on the record.

Silk Touch's argument that the Court erred by allowing jurors to submit questions without regard to the rules of evidence is also unavailing. The court followed the proper procedure by having jurors submit written questions, which the court then reviewed. The court reviewed questions before they were asked, and specifically did not ask questions that the court believed violated its prior in limine rulings, were speculative, were not relevant, or were outside the scope of a particular expert's disclosed opinions. Additionally, the court did not err by rewording questions submitted by jurors. In some instances, the jurors submitted compound questions that the court separated into multiple questions or the court reworded questions so they referred to the relevant time period at issue. Part of the purpose of requiring that the court read juror questions is to avoid these types of mistakes in form. A juror does not have knowledge of the specific form requirements, and it is well within the district court's discretion to reword submitted questions so they are proper. We hold that the district court properly employed the procedural safeguards required in Rule 47(q) and did not abuse its discretion in permitting juror questions.

2. Silk Touch did not adequately preserve its objections to specific juror questions.

On appeal, Silk Touch challenges several of the specific juror questions for varying reasons. As discussed above "[f]or an objection to be preserved for appellate review, either the specific ground for the objection must be clearly stated, or the basis of the objection must be

apparent from the context." *Hansen v. Roberts*, 154 Idaho 469, 473, 299 P.3d 781, 785 (2013); I.R.E.103(a). Silk Touch marked "objection" on every juror question. At no time did Silk Touch express the specific ground for its objections or elaborate on its objections on the record. Additionally, where Silk Touch objected to every single question, the basis of the objection to each is not clear from the context. Therefore, we decline to address Silk Touch's challenges to individual juror questions on appeal because the challenges were not properly preserved.

**F. Whether the district court's judgment should be reversed under the doctrine of cumulative error.**

Silk Touch argues that even if the district court's errors are harmless when considered alone, we should consider the impact of them together and determine that the cumulative effects of those errors prejudiced its rights. Silk Touch cites criminal cases where this Court has held that "[u]nder the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *State v. Parker*, 157 Idaho 132, 149, 334 P.3d 806, 823 (2014). However, the cumulative error doctrine is based on a criminal defendant's right to a fair trial and is not applicable in a civil case. *See State v. Field*, 144 Idaho 559, 572–73, 165 P.3d 273, 286–87 (2007) ("the cumulative error doctrine requires reversal of a conviction when there is an accumulation of irregularities, each of which by itself might be harmless, but when aggregated, the errors show the absence of a fair trial, in contravention of the defendant's constitutional right to due process.") (internal quotation marks omitted). We have never applied the doctrine of cumulative error to a civil case, and we decline to do so here.

**G. Whether the district court abused its discretion in awarding Charles attorney fees and costs for the mistrial.**

"An award of attorney fees and costs is within the discretion of the trial court and subject to an abuse of discretion standard of review." *Smith v. Mitton*, 140 Idaho 893, 901, 104 P.3d 367, 375 (2004). "The party disputing the award has the burden of showing an abuse of discretion." *Id.* Additionally, under Idaho Rule of Civil Procedure 47(u), "[t]he decision whether to declare or deny a mistrial is a matter within the discretion of the trial judge if the court determines that an occurrence at trial has prevented a fair trial." *Van Brunt v. Stoddard*, 136 Idaho 681, 686, 39 P.3d 621, 626 (2001).

Both Charles and Silk Touch rely on criminal cases, stating that when reviewing the grant of a mistrial the Court considers whether the event that brought about the motion for mistrial constitutes reversible error when viewed in the context of the full record. *See Field*, 144 Idaho at

571, 165 P.3d at 285; *State v. Johnson*, 138 Idaho 103, 106, 57 P.3d 814, 817 (Ct. App. 2002). However, this standard does not apply to review a district court's decision to grant a mistrial in a civil case. In *Field*, the Court stated: "When there is a motion for mistrial based upon prosecutorial error supported by a contemporaneous objection to the underlying procedural or evidentiary error we review the denial of a motion for mistrial for reversible error." 144 Idaho at 571, 165 P.3d at 285.

This standard had originally been set forth in *State v. Urquhart*, 105 Idaho 92, 665 P.2d 1102 (Ct. App. 1983). There, the Court of Appeals concluded that although this Court had found it is within the trial court's discretion to grant or deny a mistrial, "the phrase 'abuse of discretion' inadequately describes the focus of appellate review when a mistrial has been *denied in a criminal case*." *Id.* at 95, 665 P.2d at 1105 (emphasis added). The Court of Appeals reasoned:

> The power to declare a mistrial is the power to avert the consequences of an event at trial that might otherwise deprive the defendant of a fair trial and lead to reversal of a conviction. The exercise of this power has a constitutional dimension which goes beyond mere discretion. Moreover, as a practical matter, we cannot review the trial court's decision in the narrow light of circumstances as they may have appeared to the judge at mid-trial. By the time a case reaches us, the trial has been completed and a judgment has been entered.

*Id.* Based on this reasoning, the Court of Appeals held that "where a motion for mistrial has been denied in a criminal case, the 'abuse of discretion' standard is a misnomer." *Id.* "Rather, the question must be whether the event which precipitated the motion for mistrial represented reversible error when viewed in the context of the full record." *Id.* In the present case, the issue is not whether the denial of a motion for mistrial resulted in consequences that could lead to a reversal of a conviction. Rather, the issue before the court is whether the district court acted within its discretion in granting Charles' motion for a mistrial in a civil case. When reviewing a district court's grant of a mistrial in a civil case we apply the abuse of discretion standard of review, not the "reversible error" standard of review articulated in *Urquhart* and *Field*.

1. The district court abused its discretion in awarding Charles attorney fees for the mistrial under Idaho Rule of Procedure 47(u)

A court may declare a mistrial "if it determines an occurrence at trial has prevented a fair trial." I.R.C.P. 47(u). "If the court determines that a mistrial was caused by the deliberate misconduct of a party or attorney, the court may require the adverse party or the attorney, or both, to pay the reasonable expenses including attorney fees incurred by the opposing party or parties resulting from such misconduct." *Id.*

53

Originally, this case went to trial in November 2013. As discussed at length above, Charles had filed a motion in limine to exclude evidence of the absence of infections in other Silk Touch patients. The district court granted the motion and ruled that Silk Touch could not present such evidence because it was neither relevant nor properly disclosed. During direct examination, Silk Touch's counsel asked its expert Dr. Stiller why he believed the gram-negative rod bacteria found in Krystal was not introduced during the fat transfer procedure. Dr. Stiller responded by stating in part that there had been no pertinent or persistent infections in other patients at Silk Touch. Charles objected, and the district court discussed the issue outside the presence of the jury.

Once the jury left, the district court asked Silk Touch's counsel whether he had informed Dr. Stiller of the motion in limine ruling. Silk Touch's counsel stated that he had discussed the court's ruling on the motion in limine with Dr. Stiller on several occasions and had told him not to go into that area.[10] Charles moved for a mistrial, which the district court granted. The court granted the motion concluding:

> I said there was not to be any reference to any other infections. I don't see I have any choice but to grant a mistrial. And I will address the costs and attorney fees later, but it seems to me that this was something I addressed specifically. I said take it up outside the presence of the jury. This is a serious violation of the Court's prior order, and I don't see the Court has any choice but to grant counsel's request for a mistrial.

Over a short recess, the district court reviewed the transcript of the hearing on the motions in limine. The court concluded that it granted the motion in limine to exclude evidence of the lack of infection in other patients because the evidence was not relevant and because Silk Touch failed to disclose the underlying data reviewed by Susan Kerr in developing the list of patients who allegedly did not have infections. The court then reiterated that it was declaring a mistrial and would award Charles his expert witness fees but would reserve ruling on attorney fees. The district court additionally stated that it believed the testimony on the lack of infections was grossly prejudicial to Charles, especially where the underlying data had not been disclosed, and it believed that a mistrial was necessary because the testimony was so damaging that it could not be remedied by an instruction.

---

[10] In response to Charles' motion for sanctions, Silk Touch also submitted an affidavit from Dr. Stiller in which he stated that Silk Touch's counsel had informed him of the court's order and told him not to offer any testimony regarding the absence of infections in other Silk Touch patients.

After the second trial concluded, the district court issued its Order RE: Costs and Fees, where it awarded Charles $19,018.91 in costs as a matter of right, $54,110.80 in discretionary costs, and $70,566.50 in attorney fees for the mistrial. In its order, the district court concluded that the mistrial was triggered as a result of deliberate misconduct which came out of the direct violation of an in limine order. The court concluded that Dr. Stiller's conduct was deliberate because when asked about his opinion he went straight into the area that the Court had barred in limine, even though he had been repeatedly warned to stay away from the area. Additionally, the district court reasoned that Silk Touch's counsel was extremely experienced and was aware of the critical importance of abiding by the in limine order. The court concluded that counsel should have been aware of the risk presented with an expert who had not testified in any previous trial and had based opinions on evidence that had been declared inadmissible.

On appeal, Silk Touch argues that the district court abused its discretion in awarding attorney fees under Idaho Rule of Civil Procedure 47(u) because it erred in granting the mistrial and because the mistrial was not caused by the deliberate misconduct of a party or attorney.

Silk Touch relies on several cases where a district court's decision to deny a motion for mistrial has been upheld on review. In *Van Brunt*, the defendant had moved for a mistrial after the plaintiff's expert witness had referred to the defendant's expert as an "insurance doctor" who did not treat patients but only testified for the defense in trials. 136 Idaho at 686, 39 P.3d at 626. The defendant argued that a mistrial should be granted because of the reference to insurance. *Id.* at 686–87, 39 P.3d at 626–27. The district court denied the motion and this Court affirmed. *Id.* We held that the district court did not err in concluding that the testimony did not interfere with the defendant's right to a fair trial, especially where the court had instructed the jury to disregard the expert's comments. *Id.* at 687, 39 P.3d at 627. Silk Touch also relies on several criminal cases where the Court of Appeals has concluded that the admission of improper evidence does not require a mistrial when the jury had been properly instructed to disregard such evidence. *State v. Keyes*, 150 Idaho 543, 545, 248 P.3d 1278, 1280 (Ct. App. 2011); *State v. Grantham*, 146 Idaho 490, 498, 198 P.3d 128, 136 (Ct. App. 2008); *State v. Hill*, 140 Idaho 625, 631, 97 P.3d 1014, 1020 (Ct. App. 2004).

Although these cases would support the denial of a motion for mistrial, nothing in these opinions suggest that a district court abuses its discretion in granting a mistrial where it finds that the admission of improper evidence so prejudiced the trial that it could not be cured by an

55

instruction. The district court acted within the outer bounds of its discretion because it declared a mistrial after determining that the testimony on the lack of infections in other patients denied Charles a fair trial. Additionally, the court's determination that the testimony was so prejudicial that it could not be cured by an instruction was reached through an exercise of reason.

On several occasions, the district court explained why it excluded evidence of the lack of infections in other Silk Touch patients. Particularly, the Court found that such evidence is usually not allowed except in rare circumstances because it has very little to do with whether a defendant was negligent on a specific occasion. The district court reasoned:

> the law does not allow the absence of prior accidents to be considered in a negligence case with very rare exceptions, none of which were present in this case. Because it's that inattention. It's that inattention, it's that breach of duty that leads to the imposition for liability for negligence, and that is why the absence of other accidents in McCormick and in other good treatises is never admissible absent very limited exceptions to prove that somebody was not negligent on a particular occasion.

The court relied in part on the treatise McCormick on Evidence, which states: "In light of the prejudice that such evidence can carry with it, and because of the rule that evidence of other accidents or their absence is not admissible solely to show a character or propensity for careful or careless behavior, most judges will scrutinize it carefully." 1 McCormick on Evid. § 200 (7th ed. 2013). The Fourth Circuit has recognized that "[t]he rationale for the rule is that such evidence tends to draw away the minds of the jurors from the point in issue, and to excite prejudice and mislead them; and, moreover, the adverse party, having had no notice of such a course of evidence, is not prepared to rebut it." *Banko v. Cont'l Motors Corp.*, 373 F.2d 314, 316 (4th Cir. 1966). The district court concluded that Dr. Stiller's testimony that there had been no pertinent or persistent infections at Silk Touch was prejudicial because it had no basis in the evidence, would likely confuse jurors, and none of the information allegedly relied on had been disclosed. This left Charles with little recourse to address the testimony, and the district court had a substantial basis to conclude that the prejudice from the testimony could not be cured by an instruction. Therefore, the district court did not abuse its discretion in granting Charles' motion for a mistrial.

Silk Touch also argues that that the record does not support a finding that Silk Touch or its counsel deliberately caused the mistrial. Silk Touch argues that the mistrial was triggered by the testimony of a witness, which was not elicited by improper questioning by counsel. Additionally, Silk Touch alleges that its counsel had informed Dr. Stiller that he could not

discuss the lack of infection in other Silk Touch patients. Charles contends that the district court had a substantial basis to discredit defense counsel's statement that he had instructed Dr. Stiller not to discuss the absence of infections in other patients because defense counsel had engaged in questionable behavior throughout the first and second trial.

In its Order RE: Costs and Fees, the district court concluded that "the kind of conduct engaged in by the defense in this case was so outrageous that this Court had simply not seen such a pattern of conduct in over three decades of trying complex cases." The record on appeal provides ample support for this conclusion. Some of the more egregious examples of misconduct included defense counsel questioning a witness about life insurance deductions on Krystal's paychecks during the first trial, despite the district court's in limine order barring references to insurance, and defense counsel loudly referring to opposing counsel as a "god damn liar" in front of the jury during the second trial.

Although the record provides a basis upon which the district court could have concluded that Dr. Stiller's testimony was not accidental and that defense counsel did not take appropriate steps to warn this witness to stay away from that area—that was not the court's finding. The district court did not discredit Dr. Stiller and counsel's representation that Dr. Stiller had been warned not to testify on the absence of other infections. Rather, in its order, the district court concluded that Dr. Stiller had deliberately violated the in limine order in part because he had been repeatedly warned to stay away from the area. The district court's order does not indicate that it found the mistrial was caused by the deliberate misconduct of a party or counsel.

Rule 47(u) does not allow for an award of fees where a mistrial was caused by the deliberate misconduct of a witness. Although the district court admonished Silk Touch's counsel for inappropriate behavior throughout the first and second trial, the district court concluded that the mistrial was caused by the deliberate misconduct of Dr. Stiller. In order to support a grant of attorney fees under Rule 47(u) the district court must expressly find that the mistrial was caused by the deliberate misconduct of a party or counsel and identify the bad actor or actors against whom the fees will be assessed. The district court failed to make such findings. Therefore, we vacate the district court's award of attorney fees and remand to the district court for further consideration of this issue.

2. We affirm the district court's award of discretionary costs under Idaho Rule of Civil Procedure 54(d)(1)(D).

"Under Idaho Rule of Civil Procedure 54(d)(1)(D), '[a] trial court may, in its discretion, award a prevailing party certain costs where there has been a showing that the costs are necessary and exceptional, reasonably incurred, and should in the interests of justice be assessed against the adverse party.'" *Easterling v. Kendall*, 159 Idaho 902, 917, 367 P.3d 1214, 1229 (2016) (quoting *Hayden Lake Fire Prot. Dist. v. Alcorn*, 141 Idaho 307, 314, 109 P.3d 161, 168 (2005)).

In its Order RE: Costs and Fees, the district court awarded Charles $54,110.80 in discretionary costs under Idaho Rule of Civil Procedure 54(d)(1)(D). The court awarded Charles his trial costs and expert fees for the first trial, his travel costs for the first trial, and his costs to obtain a transcript of the first trial. The Court specifically found that these costs were necessary and exceptional because the first trial was rendered a nullity as a result of deliberate misconduct by the defense's witness, which required Charles to duplicate his proof. The court also concluded that these costs were appropriate alternatively under Rule 47(u).

On appeal, Silk Touch only challenged the court's award of costs for the first trial under Rule 47(u). Silk Touch's opening brief does not discuss Rule 54(d)(1)(D) or challenge the district court's conclusions that the costs awarded were appropriate thereunder. Therefore, we affirm the district court's award of discretionary costs on the uncontested basis. *See Rich v. State*, 159 Idaho 553, 555, 364 P.3d 254, 256 (2015).

## H. We award Charles part of his attorney fees on appeal.

Charles seeks an award of attorney fees on appeal under Idaho Code section 12-121. "The Court will award fees to a prevailing party under Idaho Code section 12–121 when the Court believes 'that the action was pursued, defended, or brought frivolously, unreasonably, or without foundation.'" *Easterling*, 159 Idaho at 918, 367 P.3d at 1230 (quoting *Idaho Military Historical Soc'y, Inc. v. Maslen*, 156 Idaho 624, 633, 329 P.3d 1072, 1081 (2014)). "Fees will generally not be awarded for arguments that are based on a good faith legal argument." *Id.*

Charles has prevailed on twenty of the twenty-one issues raised on appeal. Although Silk Touch raised good faith legal arguments as to the district court's award of attorney fees for the mistrial, the majority of the issues Silk Touch raised on appeal were frivolous and without foundation. Several of Silk Touch's arguments were precluded because it failed to preserve necessary objections at the trial court. Silk Touch also failed to address alternative bases for a number of the district court's rulings it challenged. Silk Touch's arguments challenging the

58

sufficiency of the evidence supporting the jury's verdict merely asked this Court to reweigh the evidence and reconsider the admissibility of testimony that Silk Touch failed to properly challenge at trial. Additionally, Silk Touch's challenges to the jury instructions were almost entirely focused on challenging the district court's use of the IDJI pattern instructions, which is expressly approved of in Idaho Rule of Civil Procedure 51. On appeal, Charles was forced to defend against several issues that Silk Touch in good faith should not have raised.

Accordingly, we award Charles his attorney fees on appeal except for the fees incurred in defending the district court's award of attorney fees for the mistrial.

# IV.
# CONCLUSION

We affirm the judgment of the district court except for the district court's award of attorney fees, which is vacated. We remand for the district court to further consider the issue of attorney fees. We award Charles costs, as well as part of his attorney fees, on appeal.

Justices EISMANN, BURDICK, and HORTON CONCUR.

Justice W. JONES, concurring in part and dissenting in part.

I concur with the majority's holding that there was sufficient evidence to support the jury's verdict that Silk Touch breached the applicable standard of care and that such breach was the proximate cause of Krystal's death. However, I write separately to address three issues. First, I dissent from the majority's holding that the district court did not err in submitting the issue of recklessness to the jury. Second, I dissent from the majority's holdings regarding costs and attorney's fees. Third, while I agree with the majority's finding that the district court did not abuse its discretion in permitting juror questions, I disagree with its analysis.

*1. The district court erred in submitting the issue of recklessness to the jury.*

I disagree with the majority's finding that the issue of recklessness was properly submitted to the jury despite the absence of direct expert testimony specifically addressing recklessness. Idaho Code section 6-1012 requires a plaintiff alleging medical malpractice to prove, by direct expert testimony, that the defendant "negligently failed to meet the applicable standard of health care practice of the community . . . ." I.C. § 6-1012. Direct expert testimony is required because a layperson is not qualified to reach opinions regarding most medical procedures. In fact, the fundamental rule regarding expert testimony explains that "[i]f . . .

59

specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." I.R.E. 702. It stands to reason that if expert testimony is necessary to establish the standard of care to prove negligence in a medical malpractice claim, expert testimony would also be necessary to prove recklessness—especially in cases wherein the alleged recklessness would not be obvious to a layperson.

Here, Instruction 18 defined reckless misconduct as: "reckless actions, taken under circumstances where the actor knew or should have known not only that his actions created an unreasonable risk of harm to another, but also that his actions involved a high degree of probability that such harm would actually result." A layperson is not likely to know what a reasonable doctor knew or should have known any more than he or she would know the applicable community standard of care for a doctor in a negligence action. Further, expecting the average juror to accurately determine whether the alleged misconduct involved a *high degree of probability* that such harm would *actually result*, all without the assistance of specific expert testimony, is wholly imprudent. Granted, expert testimony may not be necessary where the doctor's misconduct is "so obvious that it is within the ordinary knowledge and experience of laymen." *See Samuel v. Hepworth, Nungester & Lezamiz, Inc.*, 134 Idaho 84, 89, 996 P.2d 303, 308 (2000) (quoting *Jarman v. Hale*, 112 Idaho 270, 273, 731 P.2d 813, 816 (Ct. App. 1986)) (stating that expert testimony would be unnecessary in a legal malpractice case wherein an attorney allowed a statute of limitations to run). However, such is not the case here. Dr. Sorensen presented testimony that the Silk Touch was negligent in not using an enzymatic cleaner on his reusable tools, which a reasonable cosmetic surgeon may have known created a high likelihood of infection, but it is unlikely that the average juror would be able to make a determination of whether such an oversight crossed the threshold into recklessness unless an expert expressly opined on the subject.

In *Jones v. Crawforth*, this Court held that expert testimony was permitted because "their opinions as to the level of negligence of [the defendant doctor's] conduct were not conclusions that the average juror would be qualified to draw" and was "precisely what the statute contemplates." 147 Idaho 11, 17, 205 P.3d 660, 666 (2009). While the experts opined that the defendant was reckless in that case, this Court stated that the testimony was needed for the

60

experts' "opinions as to the level of negligence" and it was within the district court's discretion to admit it. *Id.* This Court observed that the testimony was permitted because: "(1) the experts had acquainted themselves adequately with the community standard for health care providers such as [defendant doctor], and (2) their opinions as to the level of negligence of her conduct were not conclusions that the average juror would be qualified to draw." *Id.* In sum, while *Jones* does not purport to require expert testimony to establish recklessness in a medical malpractice case, it certainly stands for the proposition that expert testimony regarding recklessness in a medical malpractice case is allowed. *Id.*

The majority's opinion focuses on the fact that a defendant only acted recklessly if he or she made a conscious choice "under circumstances where the risk and high probability of harm are objectively foreseeable." However, risks and probabilities of harm that are "objectively foreseeable" to a medical professional may not be foreseeable to a layperson. The majority attempts to avoid this problem by asserting that:

> [o]nce an expert has opined as to the applicable standard of care and how a defendant's conduct breached that standard, in many cases a lay person [sic] could determine whether a defendant made a conscious choice to engage in such conduct and whether the risk and high probability of harm were foreseeable.

However, even if an expert explains the applicable standard of care and opines that the defendant's conduct fell below the standard, a jury may not fully appreciate the unreasonable risk of harm and high degree of probability that such harm would actually result from the action. For example, a layperson can likely determine that it is both negligent and reckless for a surgeon to return to surgery after using the restroom without washing his hands. However, a layperson may not understand the risk associated with that same surgeon failing to wash his hands after touching his face or not washing far enough up his arm. In contrast, any qualified expert would likely find such conduct to be reckless, as it ignores basic medical school training. Further, by stating that "*in many cases*" expert testimony regarding negligence allows a layperson to determine whether the defendant acted recklessly, the majority necessarily recognizes that in some cases expert testimony regarding negligence is not enough. This is such a case.

The following hypothetical further illustrates my point: a patient undergoes a series of tests to determine if he has cancer. The physician reports that the patient does not have cancer. In fact, the patient does have cancer, which goes undetected and results in the patient's death. A medical malpractice lawsuit ensues. A doctor provides expert testimony that the examining

doctor negligently failed to meet the applicable standard of health care practice of the community. On what basis can a jury take one step further and determine that the examining doctor's conduct amounted to recklessness? Certainly, expert testimony opining that the doctor's conduct was more egregious than negligence would be required to find recklessness.

Trusting juries to determine if a defendant doctor was reckless—regardless of whether any expert opined that it was—increases the likelihood that juries will make incompetent findings regarding recklessness. That is my chief concern with the case at hand—whether the jury competently found that Silk Touch was reckless. Because evidence regarding recklessness was completely lacking, it is hard to imagine the basis upon which the jury made its finding. The majority's opinion will only serve to create more such claims in medical malpractice cases as plaintiffs will find it advantageous to assert a recklessness claim even if their expert is only willing to testify that the defendant's conduct was negligent.

As an aside, it is puzzling that Dr. Sorensen was not asked to opine whether Silk Touch's conduct amounted to recklessness. He was asked to opine regarding negligence—why not also ask him to opine regarding recklessness? Such an opinion would certainly be admissible, as demonstrated by *Jones*. 147 Idaho at 17, 205 P.3d at 666. Moreover, the opinion would assist the jury. I find it impossible to believe that an opinion regarding recklessness was not proffered at trial. The only conceivable explanation is that Dr. Sorensen did not believe the conduct amounted to recklessness and therefore he refused to opine that it was. I have serious concerns about the jury's finding of recklessness because not even a shred of evidence specifically addressing recklessness was presented at trial.

*2. The district court erred in awarding attorney's fees and costs to Charles.*

As a preliminary matter, I agree with the majority that the district court abused its discretion in awarding attorney's fees for the mistrial to Charles. However, I dissent from the majority's procedural decision to vacate and remand the issue for further consideration. As stated by the majority, pursuant to Idaho Rule of Civil Procedure 47(u), a mistrial caused by a witness does not result in an award of reasonable expenses including attorney's fees. Here, the district court concluded that the mistrial was caused by the misconduct of a witness. Accordingly, awarding attorney's fees under Rule 47(u) is clearly inappropriate and the matter should simply be reversed rather than vacated and remanded.

I dissent from the majority's finding that the district court's award of discretionary costs under Idaho Rule of Civil Procedure 54(d)(1)(D) was appropriate, especially considering the fact that the discretionary costs awarded on this theory were spent on the mistrial. Essentially, the district court's discretion—or lack thereof, in my opinion—permitted the award of costs associated with the mistrial, where such award would otherwise be disallowed under Idaho Rule of Civil Procedure 47(u). The award of discretionary costs contravenes the purpose of Rule 47(u) and should therefore be reversed by this Court.

I also dissent from the majority's award of attorney fees on appeal to Charles because I would find for Silk Touch on the issue of recklessness. Therefore, Silk Touch should be a prevailing party in part.

3. *Silk Touch did not adequately preserve its objections to juror questions for our review.*

The only reason I agree with the majority that the district court did not abuse its discretion in permitting juror questions is because Silk Touch did not adequately preserve its objections for our review. I acknowledge that juror questions are permitted under Idaho Rule of Civil Procedure 47(q), however, if juror questions are to be allowed, procedural safeguards must be in place. The majority's discussion of the advantages of permitting juror questions implies that the practice is universally accepted. However, that is not the case.[11] I was not present for the trial, but the transcript suggests that the entire affair resembled a three-ring circus wherein over ninety juror questions were poorly juggled. In sum, I advise that parties and judges carefully consider the pros and cons and exercise great caution in deciding whether to permit juror questions.

---

[11] There is no reason to engage in an analysis of the advantages and disadvantages of seeking juror input at trial, as commentary on the matter is readily available in law libraries and on the Internet. However, Judge N. Randy Smith, a well-respected member of the judiciary, provides valuable insight in a law review article entitled *Why I Do Not Let Jurors Ask Questions in Trials*. 40 Idaho L. Rev. 553, 565 (2004).